# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DON WHITE,

      Plaintiff,

vs.                                           No. CIV 17-0983 JB\KRS

TOWN OF HURLEY,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant Town of Hurley's Omnibus Motion for Summary Judgment and Memorandum in Support Thereof, filed August 31, 2018 (Doc. 33)("MSJ"); and (ii) the Defendant's *Daubert*[1] Motion to Exclude the Testimony and Opinions of Brian H. Kleiner and Memorandum in Support Thereof, filed August 31, 2018 (Doc. 34)("Expert Motion"). The Court held hearings on December 21, 2018, and January 15, 2019. See Clerk's Minute Sheet at 1, filed December 21, 2018 (Doc. 51); Clerk's Minutes at 1, filed January 15, 2019 (Doc. 53). The primary issues are: (i) whether the Court should grant summary judgment for Defendant Town of Hurley on Plaintiff Don White's Count I failure-to-accommodate claim under the Americans with Disabilities Act, 42 U.S.C §§ 1201-03, 12111-17, 12131-34, 12141-50, 12161-65, 12181-89, 12201-05, 12205a, 12206-13; 47 U.S.C. § 225 ("ADA"), because White was not an otherwise qualified employee, as he could not perform the job's functions, and because White did not request a reasonable accommodation when he requested

---

[1]The full case name is Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)("Daubert"). For discussion of the case, see infra Relevant Law Regarding Expert Testimony.

indefinite leave; (ii) whether the Court should grant summary judgment for the Town of Hurley on White's Count I ADA claim, because the Town of Hurley had no obligation to engage in an interactive process with White when White did not request a reasonable accommodation; (iii) whether the Court should grant summary judgment for the Town of Hurley on White's Count II ADA-retaliation claim, because White's request for indefinite leave was not a protected activity, his request did not cause the Town of Hurley to terminate his employment, and the Town of Hurley had legitimate, non-discriminatory reasons for rejecting his request; (iv) whether the Court should grant summary judgment for the Town of Hurley on White's Count III Age Discrimination in Employment Act, 29 U.S.C. §§ 621-33, 633a, 634 ("ADEA"), because White did not first raise a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and because the Town of Hurley employs less than twenty people; (v) whether the Court should grant summary judgment for the Town of Hurley on White's Count IV ADA medical-inquiry claim, because the Town of Hurley's interviewer could ask White about his injury and because the Town of Hurley rejected White's application because of its concerns about White's temperament; (vi) whether the Court should exclude the opinions, report, and testimony of Brian H. Kleiner, White's human resources expert, or grant a <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993)("<u>Daubert</u>") hearing, because Kleiner's methodology, which involves summarizing EEOC guidance and deposition excerpts that are favorable to White, is not reliable and his conclusions are legal conclusions, which result from applying the EEOC guidance to the facts; and (vii) whether the Report of Brian H. Kleiner, PH.D., filed August 31, 2018 (Doc. 34-1)("Kleiner Report"), is inadmissible hearsay. The Court grants the MSJ, and it grants in part the Expert Motion and denies it in part. The Court concludes that it will grant summary judgment as

to: (i) Count I's failure-to-accommodate claim, because White has produced insufficient evidence to establish a genuine dispute of material fact whether he was a qualified individual who could perform the essential functions of a Hurley Police Department ("HPD") officer and whether he requested a reasonable accommodation, and because the Town of Hurley had no obligation to engage in an interactive process after White did not request a reasonable accommodation; (ii) Count II's retaliation claim, because White's request for leave was not a protected activity, and because White does not show a genuine dispute of material fact whether a causal connection exists between his request for leave and his employment's termination, or whether the Town of Hurley terminated White's employment for a legitimate, non-discriminatory reason -- that it needed HPD officers who could serve on duty; (iii) Count III's ADEA claims, which White states in his MSJ Response that he will not pursue; and (iv) Count IV's medical-inquiry claim, because the Town of Hurley could lawfully ask White about his injury and recovery, and because White does not illustrate a genuine dispute of material fact whether the Town of Hurley rejected White's employment application for legitimate, non-pretextual reasons -- concerns that he could not interact courteously with Town of Hurley citizens. Further, the Court will not permit Kleiner to testify before a jury to the opinions in the Kleiner Report, because the opinions are not helpful to a trier of fact and because Kleiner lacks the qualifications to offer an expert opinion whether Town of Hurley would suffer an undue hardship if it accommodated White. For these same reasons, in deciding the MSJ, the Court will not treat Kleiner's opinions as expert testimony equivalent to factual evidence; the Court instead views Kleiner's opinions as additional legal argument. The parties may not rely on the Kleiner Report at trial, because the Court deems it inadmissible hearsay.

## FACTUAL BACKGROUND

The Town of Hurley is a municipality in the State of New Mexico, with a Mayor-Council government and a police department with "a chief, a lieutenant at times, a sergeant, and a varying number of patrolman [sic] either one or two." Plaintiff's Response to Defendant Town of Hurley's Omnibus Motion for Summary Judgment and Memorandum in Support Thereof ¶¶ 1-2, 4, 5 at 1-2, filed October 5, 2018 (Doc. 37)("MSJ Response")(asserting these facts)(citing Affidavit of Don White Jr. ¶¶ 1- 2, at 1 (taken October 5, 2018), filed October 5, 2018 (Doc. 37)("White Aff.")). See Defendant Town of Hurley's Reply to Plaintiff's Response to Omnibus Motion for Summary Judgment at 2, filed October 26, 2018 (Doc. 41)("MSJ Reply")(admitting these facts).[2]  Since August 3, 2014, the Town of Hurley "has not employed more than nineteen full- or part-time employees at any given time." MSJ ¶ 34, at 7 (asserting this fact)(citing Affidavit of Lori Ortiz

---

[2]The Town of Hurley does not explicitly state that it "admits" these, or any, facts in the MSJ Response. See MSJ Reply at 2. The Town of Hurley instead explains:

> Under Local Rule 56.1(b), *supra*, the Town is required to set forth a lettered "concise statement of those facts set forth in the Response which the [Town] disputes or to which the [Town] asserts an objection," which "state[s] the letter of the [plaintiff's] fact[s]." Consequently, the Town offers the following lettered response to several of the "facts" set forth in plaintiff's Response[.]

MSJ Response at 5 (alterations in MSJ Response). The Court reads this statement as an assertion that the Town of Hurley admits those facts to which it does not explicitly object. Moreover, the Town of Hurley offers no statement in response to those facts to which it does not object. The Court will treat those facts in the MSJ Response to which the Town of Hurley does not respond as undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted."). The Court will not repeat this footnote after each fact to which the Town of Hurley does not respond; the Court will deem that the Town of Hurley admits these facts.

¶¶ 4-5, at 1 (taken August 30, 2018), filed August 31, 2018 (Doc. 33-14)("Ortiz Aff."))[3] The Town of Hurley has employed seasonal employees, but they "did not work for the Town each working day in each of twenty or more calendar weeks for any year since August 3, 2014." MSJ ¶ 34, at 7 (asserting this fact)(citing Ortiz Aff. ¶¶ 4-5, at 1).[4] The Town of Hurley "has never employed fifty or more employees at any given time," even counting its seasonal employees. MSJ ¶ 35, at 7 (asserting his fact)(citing Ortiz Aff. ¶ 6, at 1).[5]

In February, 2010, the Town of Hurley hired White as a "police officer/patrolman." MSJ ¶ 1, at 1 (asserting this fact)(citing Deposition of Don White at 16:2-10 (taken June 4, 2018), filed August 31, 2018 (Doc. 33-1)("White Depo.")). See MSJ Response ¶ 9, at 2 (also asserting this fact).[6] At the time that the Town of Hurley hired White, Robert Ruiz was the chief of police. See MSJ Response ¶ 6, at 2 (asserting this fact)(citing White Aff. ¶ 3, at 1); MSJ Reply at 2 (admitting this fact). White had seven years of prior experience as a law enforcement officer, so HPD did not have to train White. See MSJ Response ¶¶ 7-8, at 2 (asserting this fact)(citing White Aff. ¶¶ 4-5,

---

[3]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[4]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[5]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[6]Although White does not state that he "admits" the alleged undisputed fact in the text, he asserts the same fact in his MSJ Response. See MSJ Response ¶ 9, at 2. Accordingly, the Court deems this fact undisputed.

at 1); MSJ Reply at 2 (admitting this fact). White "briefly resigned from his employ with the Town of Hurley," MSJ ¶ 2, at 1 (asserting this fact)(citing White Depo. at 16:11-15; id. at 21:9-12). See MSJ Response ¶ 11, at 2 (also asserting this fact)(citing White Aff. ¶ 8, at 1),[7] because Ruiz "had previously authorized Mr. White to have New Year's Eve and New Years Day 2014 off from duty," but HPD did not schedule White for leave during that time. MSJ Response ¶¶ 10-11, at 2 (asserting these facts)(citing White Aff. ¶¶ 7-8, at 1). See MSJ Reply at 2 (admitting these facts).

White returned to HPD on March 11, 2014, after Peter Ordonez, who hired White, replaced Ruiz as the chief of police. See MSJ ¶ 2, at 1 (asserting that White returned to work at HPD)(citing White Depo. at 16:11-15); MSJ Response ¶¶ 12-13, at 2-3 (asserting that Ordonez replaced Ruiz and hired White)(citing White Aff. ¶¶ 9-10, at 1); MSJ Reply at 2 (admitting the facts from the MSJ Response). In June, 2014, the HPD promoted White to a position as sergeant. See MSJ ¶ 3, at 1 (asserting this fact)(citing White Depo. at 16:17-10; 26:3-10); MSJ Response ¶ 14, at 3 (also asserting this fact)(citing White Aff. ¶ 11, at 2).

Soon thereafter, on July 23, 2014, White suffered an injury in an "off-duty motorcycle accident." MSJ ¶ 4, at 1 (asserting this fact)(citing Letter from Jim Foy to Mayor, Town Council and Chief of Police (dated April 30, 2016), filed September 26, 2017 (Doc. 1-6)("April 30 Letter"); White Depo. at 26:19-23; id. at 27:7-13). See MSJ Response ¶¶ 15-18, at 3-4 (asserting the same fact and the date of the accident)(citing White Aff. ¶¶ 12-15, at 2); MSJ Reply at 2 (admitting the date). White "was travelling on his motorcycle north between Hurley and Bayard near mile markers 124 and 125 on U.S. Highway 180 in a yellow lined no passing zone." MSJ Response

_____

[7]Although White does not state that he "admits" the alleged undisputed fact in the text, he asserts the same fact in his MSJ Response. See MSJ Response ¶ 9, at 2. Accordingly, the Court deems that this fact is undisputed.

¶ 15, at 3 (asserting this fact)(citing White Aff. ¶ 12, at 2).  <u>See</u> MSJ Reply at 2 (admitting this

fact).  Orlando Chavez "was travelling south on the same said road in a 2012 Dodge pick-up truck,"

and,

> [n]ear mile marker 124 and 125, Mr. Chavez crossed over the single yellow line
> signifying a no passing zone for Mr. Chavez in an attempt to recklessly pass another
> vehicle when Mr. White encountered Mr. Chavez in the Dodge pick-up truck, in
> Mr. White's lane heading directly toward Mr. White.

MSJ Response ¶ 16, at 3 (asserting this fact)(citing White Aff. ¶ 13, at 2).  <u>See</u> MSJ Reply at 2

(admitting this fact).  "According to witnesses at the scene, he [Chavez] was driving recklessly,

quite frankly, since Santa Clara."  MSJ Response ¶ 16, at 3 (citing White Aff. ¶ 13, at 2).  <u>See</u> MSJ

Reply at 2 (admitting this fact).[8]  To avoid colliding with Chavez, White laid his bike on its side

---

[8]The Town of Hurley does not object to the proposed undisputed fact in the text.  The
Court, however, deems the fact hearsay.  MSJ Response ¶ 16, at 3 (citing White Aff. ¶ 13, at 2).
"'Hearsay' means a statement that: **(1)** the declarant does not make while testifying at the current
trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the
statement."  Fed. R. Evid. 801(c).  White's statement draws on testimony from a witness at the
scene who made the statement outside the court, and White introduces the statement for the truth
of the matter asserted.  The Court can rely on evidence submitted in a form that would be
inadmissible at trial as long as the Court determines that the evidence will be presented in an
admissible form:

> This does not mean that evidence must be submitted in "a form that would be
> admissible at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, . . . (1986).  Indeed,
> parties may submit affidavits even though affidavits are often inadmissible hearsay
> at trial on the theory that the same facts may ultimately be presented at trial in an
> admissible form.  *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir.
> 2005).  However, "[t]o determine whether genuine issues of material fact make a
> jury trial necessary, a court necessarily may consider only the evidence that would
> be available to the jury" in some form.  *Argo v. Blue Cross and Blue Shield of Kan.,
> Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)(citing *Truck Ins. Exch. v. MagneTek,
> Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004)(affirming summary judgment, in light
> of the available evidence, because "[j]ury verdicts may not be based on speculation
> or inadmissible evidence or be contrary to uncontested admissible evidence")).

and "both the bike and Mr. White skidded upon the pavement for over one-hundred feet." MSJ Response ¶ 17, at 3 (asserting this fact)(citing White Aff. ¶ 14, at 2). See MSJ Reply at 2 (admitting this fact). White was not wearing his helmet at the time of the accident, see MSJ ¶ 4, at 1 (asserting this fact)(citing April 30 Letter; White Depo. at 26:19-23; id. at 27:7-13),[9] and the skidding caused White severe trauma to his head and face, see MSJ Response ¶ 17, at 3 (asserting this fact)(citing White Aff. ¶¶ 14, 16, at 2; id. ¶ 19, at 3); MSJ Reply at 2 (admitting this fact). Chavez caused the accident, and, although he fled the scene, he was later charged with multiple felonies, including leaving the accident's scene. See MSJ Response ¶¶ 20-21, at 4 (asserting these facts)(citing White Aff. ¶¶ 17-18, at 2-3); MSJ Reply at 2 (admitting these facts).

A helicopter carried White to the University Medical Center of El Paso, Texas. See MSJ Response ¶ 18, at 3-4 (asserting this fact)(citing White Aff. ¶ 15, at 3); MSJ Reply at 2 (admitting this fact). At University Medical, surgeons removed part of White's skull to allow "his brain [to] swell unobstructed" and performed "numerous face reconstruction surgeries." MSJ Response ¶ 22, at 4 (asserting this fact)(citing White Aff. ¶ 19, at 3). See MSJ Reply at 2 (admitting this fact). Without the skull surgery, White would have died. See MSJ Response ¶ 22, at 4 (asserting this fact)(citing White Aff. ¶ 19, at 3); MSJ Reply at 2 (admitting this fact). White remained hospitalized at University Medical from July 23, 2014, to August 11, 2014. See MSJ Response ¶ 23, at 4 (asserting this fact)(citing White Aff. ¶ 20, at 3); MSJ Reply at 2 (admitting this fact).

---

Trevizo v. Adams, 455 F.3d 1155, 1160 (10th Cir. 2006)(alterations in original). White does not, however, identify the speaker or in any manner suggest that the speaker is an individual whom White might offer at trial.

[9]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

From there, White transferred to the Rehabilitation Hospital of Southern New Mexico, where he remained until August 25, 2015, "when he was released to his home." MSJ Response ¶ 24, at 4 (asserting this fact)(citing White Aff. ¶ 21, at 3). See MSJ Reply at 2 (admitting this fact).

White underwent a year of hospitals, rehabilitations, and skull surgeries, and his brain injury will last and affect him, including his emotions, for the rest of his life. See MSJ ¶ 5, at 1-2 (asserting this fact)(citing White Depo. 27:24-28:2; id. at 63:12-64:16).[10] From July 23, 2014 to September 20, 2015, White continued to live without the portion of his skull "to allow his brain to heal" and to reduce to its normal size. MSJ Response ¶ 25, at 5 (asserting this fact)(citing White Aff. ¶ 22, at 3). See MSJ Reply at 2 (admitting this fact). During his recovery, White could not work at HPD. See MSJ Response ¶ 26, at 5 (asserting this fact)(citing White Aff. ¶ 23, at 3); Reply at 2 (admitting this fact). White could have returned to work after receiving an artificial skull and a release, and White was released around October 20, 2015. See MSJ Response ¶¶ 26-27, at 5 (asserting these facts)(citing White Aff. ¶¶ 23-24, at 3).[11] The injury's effects are apparent in

---

[10]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[11]The Town of Hurley objects that White "purports to set forth a medical conclusions as to when he might have been able to return to work" and that lay witnesses cannot offer such conclusions. See MSJ Reply ¶ A, at 2-3. These objections do not persuade the Court. In the cases that the Town of Hurley cites, the lay witnesses proposed to testify to specific medical diagnoses, prognoses, and causes. See Hauschild v. Powers, Civil No. 09-015-CJP, 2011 WL 2560229, *1 (S.D. Ill. June 28, 2011)(Proud, M.J.)(prohibiting a lay witness from testifying that "a delay in treatment affected his condition"); Saleh v. Fed. Bureau of Prisons, Civil Action Nos. 05-cv-02467-PAB-KLM, 06-cv-01747-PAB-KLM, 07-cv-00021-PAB-KLM, 2010 WL 5464295, *10 (D. Colo. Nov. 23, 2010)(Mix, M.J.)(excluding a lay witness' self-diagnosis of depression); Elzubier v. Sony MusicHoldings, Inc., CIVIL ACTION No. 1:10-cv-03284-SCJ, 2012 WL 12869319, at *1 (N.D. Ga. May 17, 2012)(Jones, J.)(precluding lay witness testimony about his diagnosis or prognosis). The Court interprets White's statement as describing his understanding

White's emotions and temper.  See MSJ ¶ 5, at 1-2 (asserting this fact)(citing White Depo. at 63:12-64:16).[12]

White did not correspond with HPD from July 23, 2014, to September 11, 2014, and HPD did not assert that "White abandoned his position" during that time.  MSJ Response ¶ 28, at 5 (asserting this fact)(citing White Aff. ¶ 25, at 3).[13]  After White exhausted his sick and vacation

_____

that a medical release would mean that he could return to work.  Such a comment is not a medical diagnosis, prognosis, and cause.  Moreover, the Court must interpret ambiguous facts in White's favor.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)("Liberty Lobby")("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  (citation omitted)).  The Court, therefore, considers this fact admissible.

The Court excludes in part the sections of the MSJ Response's paragraph 27 to which the Town of Hurley objects.  See MSJ Reply ¶ B, at 3.  For similar reasons, contrary to the Town of Hurley's objection, the Court concludes that White's statement that he was released on October 20, 2015, is not a medical opinion.  See MSJ Reply ¶ B, at 3.  Whether White was released is not a medical diagnosis, prognosis, or cause.  White might encounter a hearsay problem in the future if he is relying on a doctor's out-of-court statement that White was "released," but White does not indicate how he concludes that he was released, and drawing all ambiguities in White's favor, the Court infers that White might have drawn this conclusion from a non-hearsay source, such as a statement that he was healed, a release from the hospital, or a termination of regular medical appointments.  The Court, therefore, deems this statement admissible.  The Court excludes White's assertion that he was "fully healed" "on or about October 20, 2015," see MSJ Response ¶ 27, at 5, as a medical diagnosis.  Such a statement is a diagnosis of White's condition; White did not have the expertise to determine whether he was fully healed.  That White did not receive "a written doctor's release or note clearing him to return to work as a police officer," MSJ Reply ¶ B, at 3 (citing White Depo. at 40:23-41:3), goes to the weight of White's assertion that he was released, and the Court does not consider the weight of the evidence in this section, or on a motion for summary judgment.  The Court considers only the evidence's admissibility.

[12]White does not offer any statement in response to the alleged undisputed fact in the text.  The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[13]The Town of Hurley does not respond to the alleged undisputed fact in the text, although the Town of Hurley objects to White's characterization in MSJ Response ¶ 28, at 5, that it was not concerned with his ability to return to work.  See MSJ Reply ¶ C, at 2.  The Court omitted the disputed characterization from the text, but the Court deems the fact in the text undisputed.

leave, he requested that Ordonez place him on leave without pay for a year and a day, "pursuant to the Family Medical Leave Act [(5 U.S.C. §§ 6381-98; 29 U.S.C. §§ 2601, 2611-19, 2631-36, 2651-54 ("FMLA")] and/or any other applicable Town of Hurley Employment policy." MSJ ¶ 6, at 2 (asserting this fact)(quoting Letter from Jim Foy to Chief Peter Ordonez (dated September 11, 2014), filed September 26, 2017 (Doc. 1-1)("Sept. 11 Letter")).[14] In the Sept. 11 Letter, White stated that he had suffered a "significant injury to his brain," and that he would "be unable to adequately function as a Hurley Police Officer for at least one year and one day, *if ever*," and that he "faced a 'period of long and protracted recovery.'" MSJ ¶ 7, at 2 (asserting this fact)(emphasis in MSJ)(quoting Sept. 11 Letter at 1). See MSJ Response ¶ 29, at 5 (also asserting this fact).[15] White offered to provide updates on his medical condition, but the Town of Hurley never requested updates. See MSJ Response ¶ 29, at 5-6 (asserting this fact)(citing White Aff. ¶ 26, at 4; Sept. 11 Letter); MSJ Reply at 2 (admitting this fact).

"The Town of Hurley's policy permitted the Town Council to approve requests for unpaid leave." MSJ ¶ 8, at 2 (asserting this fact)(citing Town of Hurley Personnel Policy 7.3, at 2, filed September 26, 2017 (Doc. 1-5)("Hurley Policy")).[16] Under the Hurley Policy, an employee can

---

[14]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[15]White does not admit or deny the facts in the text, but he summarizes the same facts in his proposed undisputed facts. See MSJ Response ¶ 29, at 5. The Court, accordingly, deems these facts undisputed.

[16]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

"state the specific reasons for the request, the date to begin the leave, and the date of proposed return." MSJ ¶ 8, at 2 (asserting this fact)(citing Hurley Policy 7.3, at 2).[17] Concluding that granting White's request was in its best interests, the Town Council approved White's request at a Town Council meeting, which the mayor attended, and granted him retroactive leave without pay, dating to August 7, 2014, when White had exhausted his sick and vacation leave. See MSJ ¶ 9, at 2 (asserting this fact)(citing Letter from Pete Ordonez to Jim Foy (sent October 22, 2014), filed September 26, 2017 (Doc. 1-2)("Oct. 22 Letter"); Town of Hurley Regular Meeting ¶ 14, at 2 (dated October 14, 2014), filed August 31, 2018 (Doc. 33-2)("Town Hall Minutes"); White Depo. at 34:2-7). See MSJ Response ¶ 30, at 6 (also asserting this fact).[18] The Town of Hurley did not request a medical update from White. See MSJ Response ¶ 30, at 6 (asserting this fact)(citing White Aff. ¶ 27, at 4); MSJ Reply at 4 (admitting this fact).

After receiving leave for his disability, White waited for his brain to return to its normal size so that he could receive an artificial skull. See MSJ Response ¶ 32, at 6 (asserting this fact)(citing White Aff. ¶ 29, at 4); MSJ Reply at 2 (admitting this fact).[19] White's brain remained

_____

[17]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[18]White does not admit or deny the Town of Hurley's facts, but he includes the same facts in his proposed undisputed facts. Accordingly, the Court deems the facts in the text undisputed.

[19]The Town of Hurley disputes White's characterization that, during this time, he was disabled. See MSJ Response ¶ 32, at 6 (citing White Aff. ¶ 29, at 5); MSJ Reply at 4. The Town of Hurley complains that White cannot offer legal conclusions and that the statement that he was disabled is a legal conclusion. See MSJ Reply at 4. The Court cannot determine if White intends to imply that he was disabled for the ADA's purposes or if he colloquially describes his lack of a portion of his skull as a disability. The Court resolves the ambiguities in White's favor and finds

larger than ordinary until April, 2015.  See MSJ Response ¶ 31, at 6 (asserting this fact)(citing White Aff. ¶ 28); MSJ Reply at 2 (admitting this fact).  After he received a CT scan[20] that permitted the medical experts to construct a pre-made Porex plate[21] to replace the missing part of his skull, White scheduled surgery to receive his artificial skull for September, 2015.  See MSJ Response ¶ 31, at 2 (asserting this fact)(White Aff. ¶ 28, at 4); MSJ Reply at 2 (admitting this fact).

Before August 3, 2015, White informed Ordonez that he was waiting for his artificial skull and for surgery, and that he did not know how much time he would require to recover.  See MSJ ¶ 10, at 2 (asserting this fact)(citing White Depo. at 36:4-15; id. at 37:1-13; id. at 68:25-69:10; id. at 70:13-24).[22]  On August 3, 2015, "Chief Ordonez was specifically told that Mr. White's skull

---

undisputed that White was disabled in the colloquial sense.  See Hunt v. Cromartie, 526 U.S. at 550-55; Liberty Lobby 477 U.S. at 255.  Moreover, the Court notes that the Town of Hurley does not dispute whether White was disabled.  Drawing this inference in White's favor, therefore, does not prejudice the Town of Hurley.

[20]"A computerized tomography (CT) scan combines a series of X-ray images taken from different angles around your body and uses computer processing to create cross-sectional images (slices) of the bones, blood vessels and soft tissues inside your body.  CT scan images provide more-detailed information than plain X-rays do."  CT Scan, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-20393675 (last visited March 8, 2019).

[21]The Court surmises that Porex is a medical technology brand.  See Porex Surgical Products Group Corporate Profile, Ophthamology Web, https://www.ophthalmologyweb.com/9415-Porex-Surgical-Products-Group/ (last visited March 8, 2019)(referring the reader to Stryker's website, https://www.stryker.com/us/en/portfolios/orthopaedics/craniomaxillofacial.html (last visited March 8, 2019)(describing Stryker as "one of the world's leading medical technology companies and, together with our customers, is driven to make healthcare better")); Stryker Buys Porex Surgical a Day After the Boston Scientific Deal was Announced Stryker Also Ink, MPO, https://www.mpo-mag.com/contents/view_breaking-news/2010-11-09/stryker-buys-porex-surgicala-day-after-the-bo (last visited March 8, 2019).

plate had been measured but was not designed and ready for placement." MSJ Response ¶ 33, at

6-7 (asserting this fact)(citing Letter from Jim Foy to Peter Ordonez at 1 (dated August 3, 2015),

filed September 26, 2017 (Doc. 1-3)("Aug. 3 Letter"); White Aff. ¶30, at 5); MSJ Reply at 2

(admitting this fact). White requested, "pursuant to the [FMLA] and/or any other applicable Town

of Hurley employment policy," that the Town of Hurley permit him to "continue his employment

status as 'on leave without pay' for *at least* the next six months." MSJ ¶ 11, at 3 (emphasis in

MSJ)(asserting this fact)(quoting Aug. 3 Letter at 1).[23] White informed the Town of Hurley that

_____

[22]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[23]The Court adopts the Town of Hurley's description of the Aug. 3 Letter, because that description accurately reflects the Aug. 3 Letter's contents. White contends that he requested "an additional six months" and does not seem to agree with the Town of Hurley's description that he requested "at least" six months and might not return to work for six to nine months, if ever. See MSJ Response ¶ 33, at 4-5 (citing Aug. 3 Letter at 1; White Aff. ¶ 30 at 5); id. at 14-15 ("[I]t is ultimately a disputed fact between the parties as to whether the request for six months of unpaid leave is unreasonable."); Draft Transcript of Hearing at 20:4-7 (taken December 21, 2019)(Foy)("Dec. 21 Tr."). White proposes as an undisputed fact:

> On August 3, 2015, Chief Ordonez was specifically told that Mr. White's skull plate had been measured but was not designed and ready for placement. A request for an additional six months of leave without pay was requested and, upon request, we would provide medical updates to the Town upon their request.

MSJ Response ¶ 33, at 4-5 (citing Aug. 3 Letter at 1; White Aff. ¶ 30 at 5). The Supreme Court of the United States of America has directed district courts: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). The Aug. 3 Letter states:

> Don will not be in a position to be evaluated for return as a police officer for at least another six months and possibly nine months given the pace of the current progress of this case.

he would "not be in a position to be evaluated for return as a police officer for at least another six months and possibly nine months given the pace of the current progress of this case," and would "be unable to adequately function as a Hurley Police Officer for at least an additional six to nine months, *if ever.*"  MSJ ¶ 12, at 3 (emphasis in MSJ)(asserting this fact)(citing Aug. 3 Letter at 1).[24] The Town of Hurley did not request any medical updates.  See MSJ Response ¶ 33, at 7 (asserting this fact)(citing White Aff. ¶ 30, at 5); MSJ Reply at 2 (admitting this fact).

During White's absence, "the Town of Hurley was short two police officers."  MSJ ¶ 13, at 3 (asserting this fact)(citing White Depo. at 40:4-11; Deposition of Peter Ordonez at 13:2-7 (taken May 1, 2018), filed August 31, 2018 (Doc. 33-3)("Ordonez Depo.")).[25]  HPD officers' positions are safety-sensitive, and Town of Hurley needs HPD officers who can be on duty to respond to calls and who can cover the town's geographical area.  See MSJ ¶ 14, at 3 (asserting

---

As a result, it is believed Don will be unable to adequately function as a Hurley Police Officer for at least an additional six to nine months, if ever; Don requests that the Town of Hurley, pursuant to the [FMLA] and/or any other applicable Town of Hurley employment policy, continue his employment status as "on leave without pay" for at least the next six months during the period of placement of the skull plate and subsequent recovery therefrom.

Aug 3 Letter at 1.  The Aug. 3 Letter unequivocally asks for at least six months leave.  To conclude that an undisputed fact exists as to what the Aug. 3 Letter requested would be to ignore the letter's language and to state that the Aug. 3 Letter requests a sixth-month leave, as White suggests, would ignore the letter's repeated use of uncertain estimates of time: six to nine, "at least," "if ever."  The Town of Hurley quotes the Aug. 3 Letter's statements verbatim.  The Court, therefore, adopts the Town of Hurley's proposed fact.

[24]See supra note 21.

[25]White does not offer any statement in response to the alleged undisputed fact in the text.  The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

this fact)(citing White Depo. at 40:13-17; <u>id.</u> at 66:23-67:16; <u>id.</u> at 69:14-17).[26]  On August 5, 2018, Ordonez denied White's request for continued leave.  <u>See</u> MSJ ¶ 15, at 3 (asserting this fact)(citing Letter from Pete Ordonez to Jim Foy at 1 (sent August 5, 2015), filed September 26, 2017 (Doc. 1-4)("Aug. 5 Letter"); Ordonez Depo. at 9:3-10:8; <u>id.</u> at 11:16-22).[27]  Ordonez stated that, "if plaintiff did not return to work on August 8, 2015," his failure to appear "would be 'deemed as a voluntary resignation.'"  MSJ ¶ 16, at 4 (asserting this fact)(citing Aug. 5 Letter at 1; Ordonez Depo. at 14:20-15:4).[28]  The Hurley Policy provided that the Town of Hurley could approve leave without pay for over two weeks.  <u>See</u> MSJ Response ¶ 34, at 7 (asserting this fact)(citing Hurley Policy 7.3(a), at 2).[29]  The mayor permitted Ordonez alone to decide whether to extend White's leave, and the Town Council did not have a role in the decision.  <u>See</u> MSJ

---

[26]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed.  <u>See</u> D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[27]White does not offer any statement specifically in response to the alleged undisputed fact in the text.  White admits that Ordonez denied White's request.  <u>See</u> MSJ Response ¶ 35, at 7.  The Court deems, therefore, the fact undisputed.  <u>See</u> D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[28]White does not offer any statement specifically in response to the alleged undisputed fact in the text.  White admits that Ordonez denied White's request.  <u>See</u> MSJ Response ¶ 35, at 7.  The Court deems, therefore, the fact undisputed.  <u>See</u> D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[29]The Town of Hurley does not specifically controvert the proposed undisputed fact in the text and notes that the Town Council may grant such leave.  <u>See</u> MSJ Reply ¶ E, at 4-5.  The Court deems, therefore, the fact undisputed.  <u>See</u> D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Response ¶ 35, at 7 (asserting this fact)(citing Ordonez Dep. at 9:9-10:4; id. at 11:1; Hurley Policy 7.3(a); Aug. 5 Letter at 1).[30]

White did not obtain a doctor's note clearing him from duty as a police officer, did not request any position other than that of a police officer, and did not request light duty.  See MSJ ¶ 17, at 4 (asserting this fact)(citing White Depo. at 40:23-41:11; id. at 71:3-7; Ordonez Depo. at 13:19-25).[31]  Ordonez "welcome[d]" White to apply for any positions that became available if he was medically able.  See MSJ ¶ 18, at 4 (asserting this fact)(citing Aug. 5 Letter at 1).[32]  The Town of Hurley and Ordonez did not investigate accommodating White, modifying their leave policy to accommodate White, or "whether a vacant position existed that could be held for Mr. White."  MSJ Response ¶ 47, at 10-11 (asserting this fact)(citing Ordonez Depo. ¶¶ 19-25, at 10-13; id. ¶¶ 9-22, at 15; id. ¶¶ 10-14, at 16).

---

[30]The Town of Hurley replies to the alleged undisputed fact in the text by stating: "[E]ven assuming *arguendo* that former Police Chief Pete Ordonez acted unilaterally, or with only the approval of the Mayor, in declining plaintiff's August 2015 request for additional leave, that denial was proper for the reasons stated in the Town's Motion."  MSJ Reply ¶ G, at 4 (emphasis in MSJ Reply).  This statement does not deny the alleged fact in the text, because it assumes the fact.  Because the statement does not specifically controvert the purported undisputed fact by either admitting or denying it, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[31]White does not offer any statement in response to the alleged undisputed fact in the text.  The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[32]White does not respond to this statement, but he asserts the same fact in his proposed undisputed facts.  See MSJ Response ¶ 40, at 9 (citing Aug. 5 Letter at 1).  The Court deems, therefore, this fact undisputed.

In April 2016, the Town of Hurley had an opening for an HPD officer, the job requirements of which included:

> 1) being "responsible for the accomplishment of the police mission on his beat," 2) "continuously patrol[ling] every part of his patrol area giving particular attention to and frequently rechecking locations where the crime hazard is great," 3) at night, "*courteously*, but firmly, question[ing] persons on the public streets" (emphasis supplied), 4) being able to "communicate effectively orally and in writing," and 5) having the "[a]bility to establish and maintain effective working relationships with subordinates, peers and supervisors."

MSJ ¶ 19 at 4 (asserting this fact)(quoting Town of Hurley Police Department Patrol Officer, Duties and Responsibilities at 1-4, filed August 31, 2018 (Doc. 33-4)("Patrol Officer Job Description")).[33]  White applied for this position.  See MSJ ¶ 20, at 5 (asserting this fact)(citing White Depo. at 42:2-8).[34]  Mayor pro tem Freddie Rodriguez; then-councilor, now-mayor, Ed Stevens; Code Enforcement employee Delilah Huerta; and acting-sergeant Mike Zamora interviewed candidates for the position.  See MSJ ¶ 21, at 5 (asserting this fact)(citing Defendant's Answers, Responses, and Objections to Plaintiff's First Set of Interrogatories and Request for Production of Documents, Interrogatory No. 8 at 10, filed August 31, 2018 (Doc. 33-5)("Defendant's Answers to First Interrogatories")).[35]  The committee asked candidates questions

---

[33]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[34]White does not respond to the alleged undisputed fact in the text, but White states that he applied for a police position in April, 2016.  See MSJ Response ¶ 41, at 9 (citing White Aff. ¶ 39, at 6).  White's assertion aligns with the alleged undisputed fact in the text.  The Court, therefore, deems this fact undisputed.

[35]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

from a list that included generic inquiries about law enforcement. See MSJ ¶ 21, at 5 (asserting this fact)(citing White Depo. at 44:4-8).[36] The Town of Hurley was aware of White's injury. See MSJ ¶ 23, at 5 (asserting this fact)(citing Plaintiff's Answer to First Set of Interrogatories, Requests for Production and Requests for Admission, Interrogatory No. 4 at 2-3, filed August 31, 2018 (Doc. 33-6)("Plaintiff's Answers to First Interrogatories"); Deposition of Delilah Huerta at 10:1-7 (taken May 1, 2018), filed August 31, 2018 (Doc. 33-7)("Huerta Depo.")).[37] All the interviewers knew of and understood White's injury. See MSJ ¶ 45, at 10 (asserting this fact)(citing Deposition of Freddie M. Rodriguez at 13:1-14 (taken May 1, 2018), filed August 31, 2018 (Doc. 33-8)("Rodriguez Depo.")).[38] Before the formal interview, an interviewer informally asked White about his treatment and "how [he] was doing." MSJ ¶ 24, at 5 (asserting this fact)(citing White Depo. at 44:10-20).[39] During the interview, White "was angry and used profanities/curse words."

---

[36]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[37]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[38]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[39]The Court adopts the fact in the text although the Town of Hurley actually proposes as an undisputed fact: "Plaintiff stated that, at the April 2016 interview for the police officer position, someone asked plaintiff if he 'was all done with [his] treatment and how [he] was doing, kind of a follow-up'; this question, however, 'wasn't part of the interview question.'" MSJ ¶ 24, at 5 (asserting this fact)(quoting White Depo. at 44:10-20). White does not propose the same fact as undisputed, but White argues in the MSJ Response's argument section that an interviewer asked him this question before the interview began. See MSJ Response at 20. The Court must resolve

MSJ ¶ 25, at 5 (asserting this fact)(citing Huerta Depo. at 9:8-17; Rodriguez Depo. at 6:9-16; id. at 11:9-16; Deposition of Joseph Edward Stevens at 6:9-7:24; 9:13-16 (taken May 1, 2018), filed August 31, 2018 (Doc. 33-9)("Stevens Depo.")).[40]  One interviewer gave White "low-to-mid range scores for his interview," and Huerta  "wrote that plaintiff was a 'hothead' even while giving plaintiff higher interview scores."  MSJ ¶ 25, at 5 (asserting this fact)(quoting Interview Scoring at 2, and citing Interview Scoring at 1-2; Huerta Depo. at 12:25-13:14).[41]  Two of the three interview scoring sheets gave White all tens in a one to ten scale.  See MSJ Response ¶ 44, at 10 (asserting this fact)(citing Interview Scoring); MSJ Reply at 2 (admitting this fact).  In light of the interview and White's "attitude/anger," Stevens worried about White's ability to conduct one-on-one encounters with citizens and that White might not be able to fulfill the important duty of relating to citizens during such encounters.  MSJ ¶ 26, at 6 (asserting this fact)(citing Stevens

_____

all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  (citation omitted)).  Resolving the ambiguities in White's favor, the Court concludes that this questioning occurred.  As the Court deems that White agreed to this fact, the Court deems this fact undisputed.  Rodriguez does not remember an interviewer asking White this question.  See MSJ Response ¶ 45, at 10 (citing Rodriguez Depo. at 13:1-14); MSJ Reply at 2 (admitting this fact).

[40]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[41]White denies "ever being a hot head."  MSJ Response ¶ 44, at 10; Tr. at 20:18-23 (Foy). The alleged fact, however, is that Huerta perceived him as a hot head and not that White was a hot head.  See MSJ Reply at 8.  White otherwise does not respond to these statements.  Accordingly, the Court deems these facts undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Depo. at 12:21-13:9; id. at 18:11-19:9).[42]  The interview committee recommended a different candidate and, on April 28, 2016, the Town of Hurley hired that other candidate for the position. See MSJ ¶ 27, at 6 (asserting this fact)(citing Letter from Isaac Bauch to Don White (sent April 28, 2016), filed August 31, 2018 (Doc. 33-11)("April 28 Letter"); Stevens Depo. at 12:21-13:9).[43]

White applied again for a police position in January, 2018, when he applied for the Chief position. See MSJ Response ¶ 41, at 9 (asserting this fact)(citing White Aff. ¶ 39, at 5); MSJ Reply at 2 (admitting this fact).  The Town of Hurley hired Jaime Serrano for the position. See MSJ Response ¶ 41, at 9 (asserting this fact)(citing White Aff. ¶ 39, at 6); MSJ Reply at 2 (admitting this fact).  Since January, 2014, the Town of Hurley has had five chiefs of police, and at least ten people have rotated through the lieutenant, sergeant, and patrolman positions. See MSJ Response ¶ 42, at 10 (asserting this fact)(citing White Aff. ¶ 40, at 6); MSJ Reply at 2 (admitting this fact).

After the Town of Hurley rejected White, his attorney wrote to the Town of Hurley to inform it that White had "filed a formal EEOC Discrimination complaint based upon his termination *due to disability*."  MSJ ¶ 28, at 6 (emphasis in MSJ)(asserting this fact)(quoting Letter from Jim Foy to Mayor, Town Council and Chief of Police (dated April 30, 2016), filed September

---

[42]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[43]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

26, 2017 (Doc. 1-6)("April 30 Letter")).[44]   White, however, had completed an EEOC Intake Questionnaire only on April 28, 2016.   See MSJ ¶ 28, at 6 (asserting this fact)(citing Equal Employment Opportunity Commission Intake Questionnaire at 3 (dated April 28, 2016), filed August 31, 2018 (Doc. 33-12)("Intake Questionnaire")).[45]   On the Intake Questionnaire, White indicated that the basis for his disability claim was his disability, and he did not later amend or file another charge based on his age.   See MSJ ¶ 28, at 6 (asserting this fact)(citing White Depo. at 51:9-19).[46]   On July 8, 2015, White filed a Charge of Discrimination against the Town of Hurley, indicated as his bases for the discrimination "retaliation" and "disability," and alleged that the Town of Hurley discharged him when he requested a reasonable accommodation, and, consequently, that the Town of Hurley discriminated and retaliated against him based on his disability.   See MSJ ¶ 30, at 6-7 (asserting this fact)(citing Charge of Discrimination at 1 (dated July 8, 2016), filed August 31, 2018 (Doc. 33-13)).[47]   White did not indicate that the Town of Hurley discriminated against him because of his age and has not filed another discrimination

---

[44]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[45]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[46]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[47]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

charge.  See MSJ ¶ 31, at 7 (asserting this fact)(citing White Depo. at 52:2-24; id. at 53:5-9).[48]

White alleges that his request for additional unpaid leave was protected activity, see MSJ ¶ 32, at 7 (citing Plaintiff's First Answers to Interrogatories, Interrogatory No. 5, at 3; id. Interrogatory No. 9, at 4; White Depo. at 73:4-74:10; id. at 77:3-14), and was a request for a reasonable accommodation, MSJ ¶ 33, at 7 (Plaintiff's First Answers to Interrogatories, Interrogatory No. 7, at 3; id. Interrogatory No. 11 at 5; White Depo. at 76:13-19; id. at 77:15-24).[49]

---

[48]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[49]White does not offer any statement in response to the alleged undisputed fact in the text. The Court deems, therefore, the fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").
    The Town of Hurley objects to the MSJ Response's paragraphs 37, 38, 39, 46, 47, and 48 for their legal conclusions and improper reliance on the Kleiner Report.  See MSJ Reply ¶ G-H, K at 6-8. Generally, the Court agrees with the Town of Hurley.  In paragraphs 37 and 38, White cites as factual evidence only the Kleiner Report, which, as discussed infra in the Analysis section, is hearsay, and offers legal conclusions in the remaining statements.  See MSJ Response ¶¶ 37-38, at 8-9.  In paragraph 39, whether White engaged in protected activity and suffered retaliation are legal conclusions, and that the Town of Hurley terminated White after his second request for leave repeats information already in the text's undisputed facts.  See MSJ Response ¶ 39, at 9.  Paragraph 46 does not state a proposed undisputed fact about the events at issue, but notes that White provides the Court Kleiner's credentials.  See MSJ ¶ 46, at 10.  In paragraph 47, White offers inadmissible legal conclusions, as discussed infra in the Analysis section, when he states that the Town of Hurley did not act consistent with the EEOC's standards and would not have suffered an undue hardship.  See MSJ ¶ 47, at 10-11.  Paragraph 48 likewise includes an inadmissible legal conclusion.  See MSJ Response ¶ 48, at 11 ("Dr. Kleiner does not believe [the Town of Hurley] has an undue hardship . . . .").

## FINDINGS OF FACT

The Court makes findings about Kleiner under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence.  See Fed. R. Evid. 104(a).

1. Kleiner has a Bachelor of Science in administration from Drexel University, and a Master of Business Administration and a PhD in management from the University of California, Los Angeles, and is a professor at California State University.  See Draft Transcript of Hearing at 4:17-5:4 (taken January 15, 2019)(Kleiner, Foy)("Jan. 15 Tr.").[50]

2. For over forty years, he teaches graduate courses at California State University, Dominguez Hills and Chapman University.  See Jan. 15 Tr. at 5:12-17 (Kleiner, Foy); Kleiner Report at 1.

3. Kleiner teaches courses on "managing human resources, personnel management, organizational behaviors, [and] organizational behavior in administration."  Jan. 15 Tr. at 6:11-13 (Kleiner).

4. All Kleiner's teaching has touched on the ADA.  See Jan. 15 Tr. at 6:25-7:4 (Kleiner, Foy). See Kleiner Report at 1.

5. He has won several awards, including recognition for his research publications' quality. See Jan. 15 Tr. at 7:11-17 (Kleiner).

---

[50]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

6.      He specializes in management as it relates to protected categories of individuals -- like disabled individuals, and teaches and publishes on that topic.  See Jan. 15 Tr. at 7:20-8:11 (Kleiner).

7.      Kleiner has served as an expert for over twenty years, has testified at over 250 depositions and at over sixty-five trials.  See Jan. 15 Tr. at 8:18-22 (Kleiner, Foy); Kleiner Report at 1.

8.      Kleiner has written many articles, the majority of which have been in peer-reviewed publications.  See Jan. 15 Tr. at 9:10-11:22 (Kleiner).

9.      White contacted Kleiner to provide an opinion whether the Town of Hurley treated White in a manner that aligned with the EEOC's guidance.  See Jan. 15 Tr. at 11:23-12:6 (Kleiner, Foy).

10.     In the Kleiner Report, Kleiner considers the First Complaint, filed September 26, 2017 (Doc. 1)("Complaint"), and the attached exhibits, the Ordonez Depo., the Huerta Depo., the Stevens Depo., the Rodriguez Depo., the White Depo., the Equal Emp't Opportunity Comm'n, 915.002, Enforcement Guidance: Reasonable Accomodation and Undue Hardship Under the Americans with Disabilities Act (Oct. 17, 2002), available at https://www.eeoc.gov/policy/docs/accommodation.html ("EEOC Notice"), and the Employer-Provided Leave and the Americans with Disabilities Act, U.S. Equal Emp't Opportunity Comm'n (May 9, 2016), https://www.eeoc.gov/eeoc/publications/ada-leave.cfm ("Employer-Provided Leave Article").  See Jan. 15 Tr. at 12:12-20 (Kleiner); Kleiner Report at 8.

11.     To reach an opinion, Kleiner used content-analysis, which includes considering academic journals that may reference EEOC publications.  See Jan. 15 Tr. at 13:4-16 (Foy, Kleiner).

12.     Content-analysis involves obtaining data and facts -- here, the case's facts -- and comparing them to criteria for human resource management.  See Jan. 15 Tr. at 22:15-23:25 (Kleiner); Notice

of Preferred Expert Testimony at 7, filed December 19, 2018 (Doc. 49)("Expert Proffer").

13.     Human resource management relies on content-analysis, and the field recognizes the practice as an appropriate methodology.  See Jan. 15 Tr. at 24:6-23 (Foy, Kleiner).

14.     Kleiner has not written on, presented on, or taught on content-analysis.  See Jan. 15 Tr. at 34:1-19 (Williams, Kleiner); Expert Proffer at 8-9.

15.     He uses the tool mostly for his engagements as an expert, and the methodology does not dictate the themes that Kleiner considers.  See Jan. 15 Tr. at 35:2-16 (Williams, Kleiner).

16.     Kleiner understands that the EEOC is a respected source for direction on how to address discrimination, and that it promulgates hundreds of publications and guidelines, although such publications are guidance and not law.  See Jan. 15 Tr. at 14:8-3 (Foy, Kleiner).

17.     Kleiner relies on the EEOC Notice and the Employer-Provided Leave Article, because they contained guidance and hypotheticals useful to understanding an employer's actions.  See Jan. 15 Tr. at 15:17-22:10 (Kleiner).

18.     Kleiner considers the EEOC Notice and the Employer-Provided Leave Article, because they reflect the most relevant EEOC guidance even though such guidance is not "black letter law." Expert Proffer at 2.

19.     After applying his methodology, Kleiner concludes that the Town of Hurley did not comply with the EEOC's guidance, because the Town of Hurley did not investigate how it might accommodate White.  See Jan. 15 Tr. at 25:6-26:1 (Kleiner).

20.     Kleiner opines: "The defendant's treatment of Don White was not done in a manner consistent with standards established by the U.S. Equal Employment Opportunity Commission." Kleiner Report at 8.

21.     Kleiner quotes large portions of the EEOC's guidance -- specifically the guidance in the EEOC Notice, and the Employer-Provided Leave Article  See Kleiner Report at 8-15.

22.     Kleiner summarizes statements from the Ordonez Depo. and the Rodriguez Depo., and concludes:

> [T]here is insufficient evidence to suggest that the defendant did any of the following:
>
>> a. Even considered Mr. White's rights and their [sic] obligations with respect to the Americans with Disabilities Act.
>>
>> b. Modified their [sic] leave policy to accommodate Mr. White's disability.
>>
>> c. Investigated to determine if there was a vacant position that could be held for Mr. White until he returned from leave.
>>
>> d. Investigated to determine if it was an undue hardship to keep Mr. White's position open until his return or, if so, a vacant position for which Mr. White would be qualified to fill.  As it stands, according to the deposition testimony of Peter Ordonez, not having officers out on the street all the time, causing the sheriff's department or state police to cover them from time to time . . . hardly amounts to being an undue hardship.

Kleiner Report at 16-17.

23.     Kleiner did not, however, review the Town of Hurley's answer or any discovery documents when undertaking his analysis.  See Jan. 15 Tr. at 29:17-30:8 (Williams, Kleiner).

24.     He focused on themes in the facts that reflect ideas that the EEOC has established, see Jan. 15 Tr. at 31:5-19 (Williams), and he copied and pasted the EEOC guidelines so he could not be accused of editing to reflect his bias, see Jan. 15 Tr. at 37:3-11 (Williams, Kleiner).

25.     Kleiner adopts the themes from the EEOC guidelines.  See Jan. 15 Tr. at 47:3-10 (Williams, Kleiner).

26.     He bases his conclusion on the EEOC guidelines and determines that the Town of Hurley's actions did not comply with the guidelines.  See Jan. 15 Tr. at 40:18-21 (Kleiner).

27.     Kleiner references, however, two depositions in the Kleiner Report -- the Ordonez Depo. and the Rodriguez Depo., and does not explain how he applies the EEOC's guidance to the facts. See Jan. 15 Tr. at 38:16-39:12 (Williams, Kleiner).

28.     In reaching his conclusions, Kleiner "made a judgment call on what constituted sufficient evidence." Tr. at 49:7-8 (Williams). Jan. 15 Tr. at 49:9 (Kleiner).

29.     Kleiner, for instance, considered Ordonez' testimony that he needed to fill HPD officer positions. See Jan. 15 Tr. at 59:25-60:13 (Foy, Kleiner).

30.     He also considered that the Grant County Sheriff's Office and the New Mexico State Police helped cover the Town of Hurley's territory. See Jan. 15 Tr. at 60:6-18 (Foy, Kleiner).

31.     Kleiner is not a law enforcement officer, did not study documents related to Grant Sheriff's Office or NM State Police, and based his conclusions on the depositions and the EEOC guidance. See Jan. 15 Tr. at 50:4-21 (Williams, Kleiner).

32.     Several courts have excluded Kleiner's opinions. See Jan. 15 Tr. at 56:17 (Kleiner).

## PROCEDURAL BACKGROUND

White brings four claims against the Town of Hurley. See First Complaint ¶¶ 14-45, at 5-10, filed September 26, 2017 (Doc. 1)("Complaint"). He argues that: (i) the Town of Hurley violated the ADA § 12112 by not considering granting White leave without pay as a reasonable accommodation and not engaging in an interactive process with him, see Complaint ¶¶ 14-22, at 5-7; (ii) the Town of Hurley violated the ADA § 12203(a) by retaliating against him by considering his request to extend his leave without pay as a voluntary resignation, see Complaint ¶¶ 23-28, at 7; (iii) the Town of Hurley violated the ADEA § 623 by hiring two individuals under forty rather than White, who was over forty, see Complaint ¶¶ 29-37, at 7-9; and (iv) the Town of Hurley violated the ADA § 102(d)(2)(A) by asking White about his injury during the August, 2016,

interview, <u>see</u> Complaint ¶¶ 38-45, at 9-10.  In response to these claims, the Town of Hurley filed the MSJ.

       1.     **The MSJ.**

     The Town of Hurley asks that the Court grant summary judgment for it on all of White's claims.  <u>See</u> MSJ at 1.  The Town of Hurley begins by arguing that White cannot "make out a prima facie claim for failure to accommodate under the [ADA]," because White "was not 'otherwise qualified' to return to work as a Hurley Police Officer, and plaintiff's request for indefinite and extended leave to which he was not entitled did not constitute a request for a *reasonable* accommodation."  MSJ at 8 (emphasis in MSJ).  The Town of Hurley describes that the United States of America Court of Appeals for the Tenth Circuit has a three-part test for failure-to-accommodate claims; a plaintiff must show that: "(1) he is disabled; (2) he is otherwise qualified; and (3) he requested a plausibly reasonable accommodation."  MSJ at 8 (citing <u>Punt v. Kelly Servs.</u>, 862 F.3d 1040, 1050 (10th Cir. 2017)).  The Town of Hurley contends that White was not "otherwise qualified," because he could not "return to work as a police officer" on August 3, 2015.  MSJ at 9-10.  The Town of Hurley further argues that, because White could not work for over a year before August, 2015, and, in August, 2015, "the most that plaintiff could say was that he hoped to return after an additional six-to-nine months," White was not qualified.  MSJ at 11-12.  Moreover, according to the Town of Hurley, requesting an indefinite amount of time off work is not a reasonable accommodation, and White requested "an uncertain and indefinite amount of unpaid leave."  MSJ at 13.  <u>See</u> <u>id.</u> at 11-13.  The Town of Hurley adds that White "requested leave to which he was not actually entitled under the FMLA," which applies only to employers with fifty employees "at or within 75 miles of the employee's worksite."  MSJ at 15.  According to the Town

of Hurley, it has never employed that many individuals. See MSJ at 15-16. The Town of Hurley contends that a plaintiff cannot sustain a retaliation claim for denying FMLA benefits if the plaintiff is not otherwise entitled to the benefits. See MSJ at 16-17.

The Town of Hurley additionally argues that, because White did not request a reasonable accommodation, the Town of Hurley "was not actually obligated to engage in 'any interactive process' with plaintiff." MSJ at 17. The Town of Hurley notes that "the interactive process is only a means to an end," MSJ at 18 (citing Valdez v. McGill, 462 F. App'x 814, 819 (10th Cir. 2012)(unpublished)), and that "an employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA," MSJ at 18 (citing McBride v. BIC Consumer Prods., 583 F.3d 92, 101 (2d Cir. 2009); Valdez v. McGill, 462 F. App'x at 819; Rehling v. City of Chicago, 207 F.3d 1009, 1016 (7th Cir. 2000)). According to the Town of Hurley, White cannot base his ADA claim on the Town of Hurley's failure to participate in an interactive process, and the Town of Hurley had no obligation to participate in such a process. See MSJ at 18.

The Town of Hurley also argues that White cannot succeed on his retaliation claim under the ADA. See MSJ at 18. The Town of Hurley articulates a three-part standard for a prima facie retaliation case: "plaintiff must demonstrate that '(1) []he engaged in protected opposition to discrimination; (2) a reasonable employee would have found h[is] employer's subsequent action to be materially adverse; and (3) a causal connection exists between h[is] protected activity and the employer's action.'" MSJ at 19 (quoting Semsroth v. City of Wichita, 555 F.3d 1182, 1184 (10th Cir. 2009)). The Town of Hurley contends that White cannot show that he even engaged in a protected activity, because he did not request a reasonable accommodation. See MSJ at 19-20. The Town of Hurley argues that it declined to extend White's leave, because it needed HPD

officers who could serve on duty, so White cannot establish a causal connection between his activity and the rejection of his employment application, or show that the Town of Hurley rejected his employment application for pretextual reasons.  See MSJ at 20.

The Town of Hurley further argues that White cannot sustain his ADEA claim.  See MSJ at 20.  The Town of Hurley notes that White did not exhaust the administrative remedies for his ADEA claim; according to the Town of Hurley, he did not file as required a charge of discrimination with the EEOC.  See MSJ at 21.  The Town of Hurley posits that White did not check the box next to "age" in his charge of discrimination form.  MSJ at 22.  Consequently, according to the Town of Hurley, it deserves summary judgment on this claim.  See MSJ at 21.  Additionally, the Town of Hurley avers that the ADEA does not even apply to it, because, according to the Town of Hurley, it has less than twenty employees.  See MSJ at 22-23 (citing 29 U.S.C. § 630(b)).

Last, the Town of Hurley contends that White cannot sustain his "claim for disability discrimination under the ADA based" on his April, 2016, interview.  MSJ at 23.  According to the Town of Hurley, White alleges that, during the interview, an interviewer asked about his recovery to determine if the Town of Hurley would need to provide him further accommodation, but the Town of Hurley explains that, during his deposition, White admitted that the question was not part of the interview process.  See MSJ at 24.  The Town of Hurley contends that, even if the interviewer asked the question as part of the interview process, "such an inquiry was not unlawful," MSJ at 24, because the Town of Hurley could inquire about White's ability "to perform job-related functions," MSJ at 24 (internal quotation marks omitted)(quoting 42 U.S.C. § 12112(d)(2)(B)).  The Town of Hurley contends that, because the position of police officer is a "safety-sensitive

position," the Town of Hurley could ask whether White could perform the job's duties. MSJ at 24-25. According to the Town of Hurley, "[a]dditionally, when an employer could reasonably believe that an applicant's known disability will interfere with the performance of a job-related function, the employer is allowed to inquire about this disability." MSJ at 25 (citing Harris v. Harris & Hart, 206 F.3d 838, 842 (9th Cir. 2000); Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 673 (1st Cir. 1995)). For the Town of Hurley, this principle makes the question about White's recovery proper. See MSJ at 26.

The Town of Hurley further argues that White cannot show that it discriminated against him when it rejected his employment application. See MSJ at 26. The Town of Hurley describes the test for whether a plaintiff can establish a prima facie case of discrimination: "a plaintiff must establish that: (i) he is disabled; (ii) he is qualified to perform the essential functions of the job, with or without accommodation; and (iii) the employer discriminated against him because of his disability." MSJ at 26-27 (citing Davidson v. Am. Online, Inc., 337 F.3d 1179, 1188-89 (10th Cir. 2003); MacDonald v. Delta Air Lines, Inc., 94 F.3d 1437, 1443 (10th Cir. 1996)). The Town of Hurley argues that, in April, 2016, White "was not qualified to serve as a police officer or patrolman . . . , given his anger and temper." MSJ at 27. According to the Town of Hurley, White admitted that his traumatic brain injury "has lasting affects [sic] on his emotions and can occasionally be detected in his temper." MSJ at 27. The Town of Hurley indicates that an HPD officer must be able to work with citizens on the streets and that the interview committee perceived that White had anger problems, which could be directed "at a Hurley resident or townsperson," and contends that such concerns "constituted a legitimate reason to decline plaintiff's employment application." MSJ at 27. For the Town of Hurley, this situation reflects that White's "disability

was a 'determining factor' in the Town's decision to reject his application for employment." MSJ at 27.

2.    **The MSJ Response.**

White responds.  <u>See</u> MSJ Response.  White first responds that he is a qualified individual, because ADA § 12132 ("Title II") covers the Town of Hurley and because a municipality's leave program is a public program under Title II.  <u>See</u> MSJ Response at 12 (citing <u>Dertz v. City of Chicago</u>, 912 F. Supp. 319, 321 (N.D. Ill. 1995)(Manning, J.)).  According to White, under Title II, a qualified individual is an individual who "meets the essential eligibility requirements for the receipt of service or the participation in programs or activities provided by a public entity."  MSJ Response at 13 (citing <u>Dertz v. City of Chicago</u>, 912 F. Supp. at 321).  In White's view, White was a "disabled police officer," who had requested temporary unpaid leave and "met the essential eligibility requirements for participation in the leave without pay program," like the officer in <u>Dertz v. City of Chicago</u>.  MSJ Response at 13.

White further contends that he requested reasonable accommodations, because he requested "six months of additional unpaid leave."  MSJ Response at 14.  White argues that he did not request indefinite leave, and notes that the Town of Hurley had previously granted him a year of unpaid leave, and knew that the leave was to give him time for surgery and for his skull to heal.  <u>See</u> MSJ Response at 14.  White indicates that Ordonez never commented that White's request was unreasonable, and that, "in reality," White could have returned to work in three months after he made his request.  MSJ Response at 14.

White disputes that the Aug. 3 letter was not a request for a reasonable accommodation and is "an open-ended letter requesting indefinite leave."  MSJ Response at 15.  According to

White, "the letter was specific in notifying the Defendant that Plaintiff was awaiting a surgery date in the near future"; "Plaintiff has no control over when his brain fell within the normal limit to allow for measurement of an artificial skull"; and "[b]y October 20, 2015 Plaintiff was released as the artificial skull was successfully placed over his brain." MSJ Response at 15. White further posits that the Town of Hurley's leave policy permits indefinite leave without pay. See MSJ Response at 15.

White also argues that he participated in a protected activity. See MSJ Response at 15. White describes that he "does not allege that he was entitled to additional unpaid leave under the FMLA and such entitlement is not an element to establish a reasonable accommodation claim." MSJ Response at 15. White contends that, in August, 2015, "he was entitled to have the town council decide whether he was entitled to additional unpaid leave," as occurred in the fall of 2014, and, that, without an interactive process, Ordonez "unilaterally denied Plaintiff's request for unpaid leave without weighing factors and determining whether the request placed an undue burden on the business of the Town." MSJ Response at 16. White stresses that his protected activity is the request for a reasonable accommodation and for additional leave, and that the FMLA, contrary to the Town of Hurley's assertions, is irrelevant. See MSJ Response at 16.

White further emphasizes that the Town of Hurley had a duty to engage in an interactive process to determine whether it could grant him a reasonable accommodation. See MSJ Response at 17. White asserts that he does not try to make a claim only on the grounds that the Town of Hurley denied him an interactive process. See MSJ Response at 17. White contends, however, that the Town of Hurley engaged in no interactive process with him after he asked for additional leave and that Ordonez "flatly rejected to consider Plaintiff's request." MSJ Response at 17.

White additionally avers that he can establish a prima facie case of retaliation.  See MSJ Response at 18.  White argues that he engaged in protective activity by requesting "six months of leave without pay, based on a policy that did not define an upper limit for requested unpaid leave, for time to have his artificial skull placed over his exposed brain." MSJ Response at 18.  According to White, he offered the Town of Hurley medical updates and "indicated that he would be able to return once he obtained a permanent artificial skullcap that covered his entire brain."  MSJ Response at 17-18.  White avers that he experienced an adverse employment action when Ordonez would not consider his request and, instead, terminated his position.  See MSJ Response at 19.  According to White, a casual connection exists between this adverse employment action and the protected activity, because, in White's view, the adverse employment action occurred immediately in response to White's request.  See MSJ Response at 19.  White disputes that the Town of Hurley had a legitimate reason for denying his request, because, according to White: (i) the Town of Hurley presents no evidence that they considered White's request or that White's request would prevent them from "having active police officers on the force"; (ii) the Town of Hurley saw frequent turnover in its HPD officers during the period surrounding this dispute; and (iii) the Town of Hurley at times relied on the Grant Sheriff's Office and NM State Police to cover the town.  MSJ Response at 19.  White also notes that, when the Town of Hurley terminated his employment, it did not follow its personnel policy and have the Town Council make a decision regarding White's request for additional leave.  See MSJ Response at 19-20.

White additionally argues that the Town of Hurley discriminated against him when "an agent of the Defendant asked him how his rehabilitation for traumatic brain injury was going and whether he would require more rehabilitation for traumatic brain injury in the future."  MSJ

Response at 20.  White explains that the questions occurred during his April, 2016, job interview and that 42 U.S.C. § 12112 "specifically prohibits that type of questioning."  MSJ Response at 20.  White asserts that the question was asked "brief moments before the formal interview started."  MSJ Response at 21.  White complains that the Town of Hurley proffers inconsistent arguments against finding that this questioning was discrimination.  See MSJ Response at 21.  White notes that no interviewers remember asking the question, but contends that the question was asked "to assess whether they could trust hiring a person with traumatic brain injury who may require a future reasonable accommodation."  MSJ Response at 21-22 (citing Interview Scoring at 2).  White also complains that, although one interviewer "called him 'a hot head,'" "two of the three scoring sheets gave Plaintiff across the board tens on all scoring criteria on a one to ten scale."  MSJ Response at 22.  White contends that the Town of Hurley has no evidence that the interviewer asked the questions out of concerns about safety and that "only after Plaintiff was questioned [did] Freddy Rodriguez [say] that Plaintiff 'wasn't the same Don.'"  MSJ Response at 22.  White concludes the MSJ Response by withdrawing his ADEA claim.  See MSJ Response at 22.

3.     **The MSJ Reply.**

The Town of Hurley replies.  See Defendant Town of Hurley's Reply to Plaintiff's Response to Omnibus Motion for Summary Judgment, filed October 26, 2018 (Doc. 41)("MSJ Reply").  The Town of Hurley first notes that White abandons his ADEA claim and requests that the Court consequently dismiss Count 3 of the Complaint.  See MSJ Reply at 9.  The Town of Hurley argues that White relies on Title II, but the Tenth Circuit has concluded that "litigants asserting public employment discrimination claims against their state and local government

employers . . . cannot rely on Title II." MSJ Reply at 9. According to the Town of Hurley, White, therefore, cannot sustain his arguments.

The Town of Hurley also clarifies that the Tenth Circuit has concluded and cited approvingly law from other Courts of Appeals stating that an indefinite leave of absence is not a reasonable accommodation. See MSJ Reply at 10 (citing Hudson v. MCI Telecomms. Corp., 87 F.3d 1167, 1169 (10th Cir. 1996); Johnson v. E.A. Miller, Inc., 172 F.3d 62, 1999 WL 94827, at *3 (10th Cir. Feb. 25, 1999)(unpublished table opinion)). The Town of Hurley contends that White did not request a specific date to return to work, or make clear when or if he could return to work. See MSJ Reply at 10. The Town of Hurley also disputes White's characterization of its argument about the FMLA, and indicates that "[t]he Town cited those cases for the proposition that an employee requesting leave under the FMLA must, in the first instance, actually be *entitled* to such leave before he or she can state a retaliation claim based upon the denial of such a request." MSJ Reply at 11 (emphasis in MSJ Reply). The Town of Hurley contends that, because White did not make a request for a reasonable accommodation and because he was not otherwise entitled to leave, he did not engage in protected activity. See MSJ Reply at 11. The Town of Hurley reiterates that it was not under a duty to engage in an interactive process with White, because he did not request a reasonable accommodation, and because he did not identify a vacant position or request reassignment. See MSJ Reply at 12. Again, according to the Town of Hurley, White also cannot maintain a retaliation claim, because he did not make a reasonable request for accommodation. See MSJ Reply at 12. The Town of Hurley disputes that White made a request for a definite accommodation. See MSJ Reply at 12. The Town of Hurley also repeats that an employer can

inquire about an applicant's ability to perform job-related functions and so the question at the interview was proper.  See MSJ Reply at 12.

### 4.  **The Expert Proffer.**

White also provides a Notice of Preferred Expert Testimony, filed December 19, 2018 (Doc. 49)("Expert Proffer"), in which he describes his proposed questions for Kleiner and Kleiner's proposed testimony.  See Expert Proffer at 0.  The Expert Proffer indicates that White will cover Kleiner's experience, his initial involvement in the case and the information that he considered in reaching conclusions.  See Expert Proffer at 1-2.  The Expert Proffer also contains Kleiner's opinion and sub-opinions.  See Expert Proffer at 9.

### 5.  **The Expert Motion.**

The Town of Hurley asks that the Court exclude Kleiner's opinions, report, and testimony. See Expert Motion at 1.  The Town of Hurley contends that, in Kleiner's report, he offers a one-sentence opinion: "[T]he Town of Hurley's 'treatment of [White] was not done in a manner consistent with standards established by the U.S. Equal Employment Opportunity Commission.'" Expert Motion at 4 (quoting Kleiner Report at 8).  The Town of Hurley contends that the Kleiner Report consists largely of sections that he copied and pasted from the EEOC Notice and the Employer-Provided Leave Article.  See Expert Motion at 4-5.  The Town of Hurley explains that Kleiner cherry-picks deposition excerpts for his report, and omits sections such as Ordonez' statement that the Town of Hurley had already given White over a year of leave, that the Town of Hurley "was short two police officers" during White's absence, that the Town of Hurley did not have open positions for White in August, 2015, or that White did not obtain a notice that he could return to work.  Expert Motion at 5-6.

The Town of Hurley argues that Kleiner's conclusions are mostly legal opinions. See Expert Motion at 9. The Town of Hurley notes that the EEOC's publications are just the agency's interpretations of the law. See Expert Motion at 9-10. The Town of Hurley objects to Kleiner's opinions that: (i) the Town of Hurley did not consider White's rights or its responsibilities under the ADA; (ii) the Town of Hurley did not reasonably accommodate White; and (iii) the Town of Hurley not having police officers on duty is not an undue hardship. See Expert Motion at 10-11. The Town of Hurley notes that other courts have excluded Kleiner's testimony. See Expert Motion at 12 (citing English v. Estes Express Lines, Case No. 5:16-cv-01353-CAS(SKx), 2018 WL 1136058 (C.D. Cal. Feb. 15, 2018)(Snyder, J.); Kuang v. Bel Air Mart, 205 F. Supp. 3d 1155, 1159-61 (E.D. Cal. 2016)(Mendez, J.); Wagner v. ABW Legacy Corp, Inc., No. CV-13-2245-PHX-JZB, 2016 WL 880371 (D. Ariz. March 8, 2016)(Boyle, M.J.); Sullivan v. Salt River Project Agric. Improvement & Power Dist., No. CV-12-01810-PHX-SRB, 2014 WL 11514480, at *4 n.7 (D. Ariz. June 5, 2014)(Bolton, J.); Brown v. West Corp., No. 8:11CV284, 2014 WL 1757576 (D. Neb. May 1, 2014)(Strom, J.); Carmichael v. Raytheon Co., Case No. CV 09-3089 GAF (Ex), 2010 WL 11549436 (C.D. Cal. Nov. 4, 2010)(Feess, J.); Rieger v. Orlor, Inc., 427 F. Supp. 2d 99 (D. Conn. 2006)(Arterton, J.); Marting v. Crawford & Co., No. 00 C 7132, 2004 WL 305724 (N.D. Ill. Jan. 9, 2004)(Ashman, M.J.)). The Town of Hurley complains that, here, like in the other cases in which courts have excluded Kleiner's testimony, Kleiner draws on no "particular methodology" and applies the law to the facts, which "is precisely what the jury would be tasked to do in this case." Expert Motion at 18. The Town of Hurley notes that Kleiner relied on the EEOC to establish the appropriate standard and then ignored deposition testimony that did not support his views. See Expert Motion at 18-19. The Town of Hurley concludes by noting that Kleiner's report

is inadmissible hearsay.  See Expert Motion at 19 (citing Potts v. Sam's Wholesale Club, 108 F.3d 1388 (10th Cir. 1993)(unpublished table decision); Skyline Potato Co. v. Hi-Land Potato Co., No. CIV 10-0698 JB/RHS, 2013 WL 311846, at *15 (D.N.M. Jan. 18, 2013)(Browning, J.); Vondrak v. City of Las Cruces, No. CIV 05-0172 JBLFG, 2007 WL 2219449, at *3 n.4 (D.N.M. May 14, 2007)(Browning, J.)).

6.      **The Expert Response.**

White responds.  See Plaintiff's Response to Defendant Town of Hurley's Daubert Motion to Exclude the Testimony and Opinions of Brian H. Kleiner and Memorandum in Support Thereof, filed October 12, 2018 (Doc. 39)("Expert Response").  White indicates that, although the Town of Hurley does not "directly raise an argument about whether Dr. Kleiner is qualified," Kleiner has thirty-five years "as a professor of Human Resources Management in the College of Business and Economics at California State University."  Expert Response at 2.  White contends that Kleiner's opinion is reliable, because he explains the human resource management and methodology he uses, and relies on sixteen journals to support his approach.  See Expert Response at 3.  Moreover, according to White, Kleiner "employs content-analysis and compares facts he deems relevant to form his opinion," and considers the Complaint, the White Depo., the Ordonez Depo., the Huerta Depo., the Rodriguez Depo., the EEOC Notice, and the "Employer-Provided Leave."  Expert Response at 3.  White argues that Kleiner's testimony is relevant, because, according to White, it addresses whether the Town of Hurley's actions aligned with the EEOC's standards and it helps the jury to decide whether White made a request for accommodation, whether the request was reasonable, and whether the Town of Hurley "failed to engage in an interactive process."  Expert Response at 4.  See Expert Response at 3-4.  White contends that Kleiner does not offer legal

conclusions and argues: "A legal conclusion would be the proposition that Defendant violated the American with Disabilities Act against Plaintiff. Another legal conclusion would be Plaintiff is disabled under the ADA or Plaintiff's request for accommodation was in fact reasonable under the ADA." Expert Response at 5. According to White, the EEOC has promulgated standards for how an employer interacts with a disabled employee, and, in White's view, Kleiner opines that the Town of Hurley did not act consistent with these standards. See Expert Response at 6. White summarizes:

> Dr. Kleiner says that the frame work [sic] an employer needs to consider first includes understanding both the employees and the employers [sic] rights and obligations under the ADA. Next, determine whether employer can accommodate employee in granting additional unpaid leave, determine whether there is a vacant position that could be held for employee and finally undertake an investigation to determine if employees [sic] position could remain open until he returns or there is an undue hardship. From the record reviewed by Dr. Kleiner, Ordonez' investigation and ultimate decision did not follow standards established by the EEOC . . . .

Expert Response at 6-7. White contends that previous courts' decisions about Kleiner are irrelevant, because the Court has leeway to decide whether to admit expert testimony and should make its own decision here. See Expert Response at 7. White lastly notes that the Town of Hurley does not explain why Kleiner's opinion is inadmissible hearsay and disputes that it is inadmissible hearsay. See Expert Response at 7-8.

**7.    The Expert Reply.**

The Town of Hurley contends that White has not met his burden as the proponent of Kleiner's testimony to show that Kleiner's testimony is admissible by a preponderance of the evidence, because, according to the Town of Hurley, White has offered generalities only and not shown that Kleiner's testimony is based on sound methodology or proffers proper, non-legal,

conclusions. <u>See</u> Defendant's Reply to Plaintiff's Response to Daubert Motion to Exclude the Testimony and Opinions of Brian H. Kleiner and Memorandum in Support Thereof at 2, filed October 26, 2018 (Doc. 42)("Expert Reply"). The Town of Hurley repeats its argument that Kleiner's testimony is not based on reliable methods: "Kleiner read the documents provided to him by plaintiff's counsel, cherry-picked those 'facts he deem[ed] relevant to form his opinions,' copied-and-pasted excerpts from EEOC guidance materials, and then stated his conclusions." Expert Reply at 4 (quoting Expert Response at 3). According to the Town of Hurley, to support Kleiner's testimony, the "Plaintiff conclusorily offers Dr. Kleiner's own statement that 'content-analysis . . . is a universally recognized scientific method,' i.e. plaintiff suggests that this Court should simply take Dr. Kleiner's word for it." Expert Reply at 4 (quoting Expert Response at 6). According to the Town of Hurley, this unreliability makes Kleiner's opinions and testimony inadmissible. <u>See</u> Expert Reply at 4-5.

The Town of Hurley further contends that Kleiner merely applies the law to the facts, which is impermissible. <u>See</u> Expert Reply at 4-5. According to White, Kleiner's "opinions merely parrot plaintiff's allegations and deposition testimony that he was subjected to discrimination." Expert Reply at 6. The Town of Hurley also argues that it is relevant and persuasive that other courts have excluded White's testimony in cases resembling this litigation. <u>See</u> Expert Reply at 7 (citing <u>English v. Estes Express Lines</u>, 2018 WL 1136058; <u>Wagner v. ABW Legacy Corp, Inc.</u>, 2016 WL 880371). The Town of Hurley repeats that Kleiner's expert report is inadmissible hearsay and avers that White has not identified an exception under which the report would be admissible. <u>See</u> Expert Reply at 8-9. The Town of Hurley concludes by noting that "there are no genuine issues of material fact in this case," and that, to dispute the Town of Hurley's proposed undisputed facts,

White offers nothing more than legal conclusions, on which neither White nor his expert can rely. See Expert Reply at 7.

8. **The December 21, 2018, Hearing.**

The Town of Hurley began the hearing by indicating that they believed that the facts were "pretty much undisputed," Draft Transcript of Hearing at 4:7-8 (taken December 21, 2019)(Jarmie)("Dec. 21 Tr."), and it summarized the facts, see Dec. 21 Tr. at 4:17-5:23 (Jarmie); id. at 6:22-8:3 (Jarmie). In response to the Court's inquiry about the facts, the Town of Hurley indicated that it treats as additional facts any of White's proposed undisputed facts with which it disagrees. See Dec. 21 Tr. at 8:11-22 (Court, Jarmie). The Town of Hurley then summarized its arguments against the failure-to-accommodate claim. See Dec. 21 Tr. at 9:20-10:14 (Jarmie). The Town of Hurley encouraged the Court to consider Hwang v. Kansas State University, 753 F.3d 1159 (10th Cir. 2014), in which the Honorable Neil Gorsuch, then-United States Circuit Judge for the Tenth Circuit, notes that an employee who cannot work is not capable of performing the job's essential functions and that the reasonable-accommodation requirement does not mandate that the employer maintain an employee's position forever. See Dec. 21 Tr. at 10:15-11:25 (Jarmie). The Town of Hurley suggested that the request for leave in Hwang v. Kansas State University was more definite than White's request was. See Tr. at 10:25-11:4 (Jarmie). The Town of Hurley also drew the Court's attention to Valdez v. McGill, and Rascon v. US West Communications, Inc., 143 F.3d 1324 (10th Cir. 1998). See Dec. 21 Tr. at 11:19-23 (Jarmie). The Town of Hurley expressed that, if the Court reads the Aug. 3 Letter, it will quickly determine that, contrary to White's arguments, White requested indefinite leave. See Dec. 21 Tr. at 12:7-10 (Jarmie).

The Town of Hurley posited that the FMLA claim does not apply to it, because it has less than fifty employees. See Dec. 21 Tr. at 12:21-13:6 (Jarmie). The Town of Hurley also indicated that White cannot sustain his argument that the Town of Hurley did not undergo an interactive process with him, because White neither was a qualified employee nor requested a reasonable accommodation. See Dec. 21 Tr. at 13:70-14:4 (Jarmie). The Town of Hurley further contended that White did not engage in protected activity and reiterated why White cannot support a retaliation claim. See Dec. 21 Tr. at 14:11-15:5 (Jarmie). The Town of Hurley did not address the ADEA claim, because White conceded that he abandons that claim. See Dec. 21 Tr. at 16:6-12 (Jarmie, Foy). See also id. at 41:2-4 (Foy). The Town of Hurley then repeated its arguments from the MSJ against White's medical-inquiry and disability-discrimination claims. See Dec. 21 Tr. at 16:13-17:20 (Jarmie).

White agreed that the parties do not dispute the facts. See Dec. 21 Tr. at 19:1-7 (Foy). The Court asked White with which facts from the MSJ he disagreed. See Dec. 21 Tr. at 19:8-13 (Court). White responded that he disputes: (i) paragraph 25, which alleges that he had used curse words and profanities during the interview, see Dec. 21 Tr. at 19:20-22 (Foy); (ii) paragraph 26, which states that White "had an apparent attitude of anger," Dec. 21 Tr. at 20:1-2 (Foy); and (iii) paragraphs 32 and 33, which address whether White requested indefinite leave, see Dec. 21 Tr. at 20:4-7 (Foy). White indicated that his paragraph 44 contradicts paragraph 25, see Dec. 21 Tr. at 20:18-23 (Foy), and that his paragraph 45 states that Rodriguez did not recall asking about White's injuries, see Dec. 21 Tr. at 20:23-25 (Foy).

White repeated that he was qualified and had requested a reasonable accommodation. See Dec. 21 Tr. at 32:5-32:23 (Foy). White indicated that he believes that he could not have worked

anywhere within the Town of Hurley until he received his artificial skull, because any incident might have severely injured him.  See Dec. 21 Tr. at 22:20-23:2 (Foy).  White argued that the Town of Hurley's leave without pay policy does not limit an employee's amount of leave and that he qualified under the policy.  See Dec. 21 Tr. at 24:25-25:8 (Foy).  White reiterated his contention that Ordonez unilaterally decided to deny his request for additional leave.  See Dec. 21 Tr. at 28:9-18 (Foy).  White differentiates Hwang v. Kansas State University from this case, arguing that, in Hwang v. Kansas State University, the university had a six-month maximum leave policy but that the Town of Hurley's policy is unlimited.  See Dec. 21 Tr. at 29:10-30:11 (Foy).  White argued that Ordonez did not contact White to determine exactly the time that White might need to recover or otherwise discuss accommodating White.  See Dec. 21 Tr. at 30:12-19 (Foy).  White reiterated that he did not request indefinite leave; according to White, he requested sufficient time for his skull to heal and, by October, 2015, that healing had completed.  See Dec. 21 Tr. at 31:5-9 (Foy).  White contended that the Town of Hurley had a duty to engage in an interactive process to negotiate his request for leave.  See Dec. 21 Tr. at 37:6-25 (Foy).

White argued that the Town of Hurley did not have a legitimate reason to fire White, because, if the Town of Hurley were down two officers, Ordonez could have begun to resolve the problem by hiring one officer before firing White.  See Dec. 21 Tr. at 33:25-34:13 (Foy).  White noted that the Grant Sheriff's Office and the NM State Police could help the HPD and that, because the Town of Hurley saw considerable turnover in the HPD during this period, the Town of Hurley would not have suffered an undue hardship if it had accommodated White.  See Dec. 21 Tr. at 35:1-24 (Foy).

White indicated that he makes no claim based on the FMLA and that he merely mentioned the FMLA in a letter to the Town of Hurley.  See Dec. 21 Tr. at 36:20-37:5 (Foy).  White further noted that the Town of Hurley retaliated against him when it dismissed him based on his request for additional leave.  See Dec. 21 Tr. at 38:1-23 (Foy).  White also explained his arguments about the preemployment medical inquiry, depicting his theory as a claim of discrimination and of an improper inquiry.  See Dec. 21 Tr. at 39:2-40:25 (Foy).

In rebuttal, the Town of Hurley disputed White's description of the MSJ's paragraphs 25 and 26 for the reasons listed in the MSJ Reply.  See Dec. 21 Tr. at 41:25-42:14 (Jarmie).  The Town of Hurley again referred the Court to the Aug. 3. Letter as evidence that White requested indefinite leave.  See Dec. 21 Tr. at 42:15-23 (Jarmie).  The Town of Hurley also repeated its objection to White's reliance on Dertz v. City of Chicago.  See Dec. 21 Tr. at 42:24-43:23 (Jarmie).

The Town of Hurley then moved to the Expert Motion.  See Dec. 21 Tr. at 46:12-13 (Jarmie).  The Town of Hurley repeated its arguments from the Expert Motion, including that Kleiner applies the EEOC's guidance to the facts and that the EEOC's interpretations are not even binding on the Court.  See Dec. 21 Tr. at 46:14-47:14 (Jarmie).  The Court asked whether White used Kleiner's opinions in the MSJ Response.  See Dec. 21 Tr. at 47:12-14 (Court).  The Town of Hurley responded that White did not cite Kleiner, but White disagreed.  See Dec. 21 Tr. at 47:15-20 (Jarmie, Court, Foy).  White asserted that the MSJ Response's paragraphs 46 through 48 rely on Kleiner.  See Dec. 21 Tr. at 53:2-3 (Foy).  The Town of Hurley indicated that the MSJ Response's paragraph 48 addresses whether the Town of Hurley would suffer an undue hardship if it had accommodated White and noted that Kleiner has no expertise in police management on which to base such an opinion.  See Dec. 21 Tr. at 60:3-17 (Jarmie).

The Court stated that it is reluctant to exclude an expert under <u>Daubert</u> unless it gives the proponent of the expert an opportunity to bring the expert to Court to testify; the Court does not require the expert to come if no one wants the expert to testify, but it gives the opportunity.  <u>See</u> Dec. 21 Tr. at 51:9-15 (Court).  The Court offered to White that the Court and the parties could have an evidentiary hearing before the Court decides to exclude Kleiner's testimony, and White accepted the offer.  <u>See</u> Dec. 21 Tr. at 51:9-16 (Court, Foy).  White also indicated that he had filed the Expert Proffer.  <u>See</u> Dec. 21 Tr. at 51:22-24 (Foy).  White explained that he understood that the EEOC guidance does not establish the law, but that he would argue that Ordonez "had an obligation to look up EEOC edicts with regard to this . . . case and didn't even do that."  Dec. 21 Tr. at 53:16-19 (Foy).  White described that Kleiner opines that the Town of Hurley acted "outside the realm of anything that the EEOC puts out now."  Dec. 21 Tr. at 54:7-8 (Foy).  White opined that he did not believe that the Town of Hurley even considered the case an ADA case.  <u>See</u> Dec. 21 Tr. at 56:4-11 (Foy).  White argues that Kleiner does not put forth legal conclusions but indicates simply that the Town of Hurley ignored the ADA standards.  <u>See</u> Dec. 21 Tr. at 37:5-11 (Foy).  White describes that Kleiner "lays out the framework that the employer needs to consider." Dec. 21 Tr. at 58:4-6 (Foy).  White explained that Kleiner's testimony goes back to White's earlier arguments about the Town of Hurley's failure to engage in an interactive process.  <u>See</u> Dec. 21 Tr. at 59:10-20 (Foy).

        **9.**        **<u>The January 15, 2018, Hearing</u>**.

The Town of Hurley contended that Kleiner does not base his testimony on sufficient facts and data.  <u>See</u> Jan. 15 Tr. at 63:22-23 (Williams).  According to the Town of Hurley, Kleiner does not consider the whole record or any relevant discovery.  <u>See</u> Jan. 15 Tr. at 63:24-64:9 (Williams).

The Town of Hurley also argued that content-analysis is unreliable, because, according to the Town of Hurley, all that Kleiner's analysis entails includes quoting the EEOC guidelines and the facts, and citing several articles, and Kleiner does not teach content-analysis or identify sources that validate it. See Jan. 15 Tr. at 64:21-65:9 (Williams). The Town of Hurley also argues that Kleiner does not reliably apply a methodology to this case, because he does not reveal how he reaches his conclusions. See Jan. 15 Tr. at 65:13-17 (Williams). Moreover, for the Town of Hurley, that Kleiner takes the EEOC guidance and applies it to the facts means that he engages in reaching legal conclusions. See Jan. 15 Tr. at 65:21-66:5 (Williams).

White responded that Kleiner relies on sufficient evidence, and noted that the parties dispute the evidence's weight and not its admissibility. See Jan. 15 Tr. at 66:16-67:12 (Foy). White contended that Kleiner's testimony reveals that content-analysis is reliable. See Jan. 15 Tr. at 67:12-15 (Foy). White explained that, under this method, Kleiner gathers the key documents, identifies the themes and important facts, and determines whether what occurred followed the EEOC's guidance. See Jan. 15 Tr. at 68:1-25 (Foy). White argues that Kleiner does not offer legal conclusions, because, according to White, Kleiner considers whether he has sufficient evidence to determine whether the Town of Hurley acted in line with the EEOC's guidance and the relevant inquiry for the case is how an employer handles a disabled employee. See Jan. 15 Tr. at 69:8-70:25 (Foy). White summarizes Kleiner's testimony: the Town of Hurley did not attempt to accommodate White and would not suffer an undue hardship. See Jan. 15 Tr. at 71:1-8 (Foy). White described that Kleiner provides for the jury standards by which to measure the Town of Hurley's actions. See Jan. 15 Tr. at 71:14-21 (Foy).

The Court asked whether the parties thought that Kleiner's testimony was relevant to the

summary-judgment analysis.  See Jan. 15 Tr. at 72:6-10 (Court).  White opined that Kleiner's testimony raised issues primarily related to trial and that Kleiner could opine to the standard that the jury should consider.  See Jan. 15 Tr. at 72:11-18 (Foy).  The Court indicated that it would likely clip Kleiner's testimony, and promised to provide the parties an opinion further discussing the MSJ and the Expert Motion.  See Jan. 15 Tr. at 73:22-74:19 (Court).  This Memorandum Opinion and Order is the promised opinion.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(alteration in Herrera v. Santa Fe Pub. Sch.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment."  Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in Celotex).[51]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").  A moving party may also obtain summary judgment in its favor without itself introducing evidence by arguing that the nonmoving party has not produced sufficient evidence to establish a prima facie case.  See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor).  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court confronted such a situation, and granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.  See 184 F. Supp. 3d at 1075-78.  The Court reasoned that the

---

[51]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common or lay knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  Without the requisite evidence, the plaintiff, the Court determined, failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir.

1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."  (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill"); Vitkus v. Beatrice Co., 11 F.3d at 1539).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249

(citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)(quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  <u>Liberty Lobby</u>, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 550-55 (1999); <u>Liberty Lobby</u>, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).  Fourth, the court cannot decide any issues of credibility.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In <u>Scott v. Harris</u>, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts.  <u>See</u> 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those

facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

       That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

       The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces). "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[52]] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(unpublished).

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." United States v. Christy, No. CR 10-1534 JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802). Rule 801(c) of the Federal Rules of Evidence provides: "'Hearsay' means a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination." United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999). A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove

---

[52]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion from the Tenth Circuit to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Rhoads v. Miller, Valdez v. McGill, 462 F. App'x 814 (10th Cir. 2012)(unpublished), Mitchell v. City of Wichita, 140 F. App'x 767 (10th Cir. 2005)(Browning, J.)(unpublished), Hankishiyev v. ARUP Laboratories, 732 F. App'x 673 (10th Cir. 2018)(unpublished), and Logsdon v. Turbines, Inc., 399 F. App'x 376 (10th Cir. 2010)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

the truth of the matter asserted, including impeaching a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay.").

Hearsay is generally unreliable and untrustworthy. See Chambers v. Mississippi, 410 U.S. 284, 298 (1973)(noting that hearsay is generally untrustworthy and lacks traditional indicia of reliability); United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)("Hearsay is generally inadmissible as evidence because it is considered unreliable." (citing Williamson v. United States, 512 U.S. 594, 598 (1994))); United States v. Console, 13 F.3d 641, 656 (3d. Cir. 1993)(stating hearsay is "inherently untrustworthy," because of the lack of an oath, presence in court, and cross examination (quoting United States v. Pelullo, 964 F.2d 193, 203 (3rd Cir. 1992))). Testimonial proof is necessarily based upon the human senses, which can be unreliable. See 5 Jack Weinstein & Margaret Berger, Weinstein's Federal Evidence § 802.02[1][b], at 802-5 (Joseph McLaughlin ed., 2d ed. 2017)("Weinstein's Federal Evidence"). The Anglo-American tradition uses three devices to illuminate inaccuracies in the testimonial proof: (i) the oath; (ii) personal presence at trial; (iii) and cross examination. See Weinstein's Federal Evidence § 802.02[2][a], at 802-5. It is difficult to evaluate the credibility of out-of-court statements when the three safeguards mentioned above are unavailable. See Weinstein's Federal Evidence § 802.02[3], at 802-6 to -7. Courts view hearsay evidence as unreliable because it is not subject to an oath, personal presence in court, or cross examination. See, e.g., United States v. Console, 13 F.3d at 656.

"Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. See, e.g., United

States v. DeLeon, 316 F. Supp. 3d 1303, 1306 (D.N.M. 2018)(Browning, J.)(noting that a hearsay within hearsay issue remains after concluding that rule 803(8) provided an exception for law enforcement reports); Wood v. Millar, No. CIV 13-0923 RB/CG, 2015 WL 12661926, at *4 (D.N.M. Feb. 19, 2015)(Brack, J.)(noting that witness statements in police reports may be admissible under hearsay exclusions other than rule 803(8)).

## RELEVANT LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided [Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)("Daubert"], trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert, whether the opinion testimony is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224. "Daubert . . . requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.[53]

---

[53]One of the things that consistently amazes the Court is the unwillingness of modern lawyers to tailor their briefing to the particular judge before whom they argue. The Court still gets briefings filled with citations to other district cases, even though it has written opinions more directly on point. See, e.g., United States v. Begay, 310 F. Supp. 3d 1318, 1336 (D.N.M. 2018)(Browning, J.)(party citing Caine v. Burge, No. 11 C 8996, 2013 WL 1966381, at *1 (N.D. Ill. May 10, 2013)(Durkin, J.) to argue for admitting expert testimony); United States v. Chapman, No. CR 14-1065 JB, 2015 WL 10401776, at *3 (D.N.M. Aug. 28, 2015)(Browning, J.)(party citing First Data Corp. v. Konya, No. CIV 04-0856, 2007 WL 2116378, at *10 (D. Colo. July 20, 2007)(Kane, J.)). There is nothing wrong -- and a lot right -- with our colleagues in other states, but it mystifies the Court why lawyers continue not to research and know the judge before whom they are practicing.

1.      **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

---

Nowhere is the need to research the presiding judge more important than in the Daubert area. Given Daubert's and rule 702's demands, trial judges often have to write detailed opinions, with findings of fact and conclusions of law. See, e.g., Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150 (D.N.M. 2016)(Browning, J.); United States v. Rodriguez, 125 F. Supp. 3d 1216 (D.N.M. 2015)(Browning, J.); Montoya v. Sheldon, 286 F.R.D. 602 (D.N.M. 2012)(Browning, J.) Cf. Admissibility of Scientific Evidence, SJ081 ALI-ABA 1 , 21 ("Appellate courts increasingly insist that even when no *Daubert* hearing is held, the district court must create a sufficient record so that the basis for the admissibility decision can be reviewed."). The written opinions are a goldmine for figuring out what the trial judge is going to do with the next expert's report. Lawyers should research their judge thoroughly through Lexis and Westlaw. In the twenty-first century, litigants can know their judge like the hand knows the glove.

When the Court was a young associate at a large law firm after its clerkships, the Court and a co-associate, and the Court's future law partner, would swing by the University of New Mexico School of Law every evening after work, alternating days, to go through a box of slip opinions by the federal judges. The lower federal judges in the early 1980s would send the opinion to the counsel of record by mail but also send a copy to the law library. The Court and the other associate would copy almost every opinion and create binders by subject matter: rule 12(b)(1), rule 32, rule 56, etc. Some binders got so large that they got dividers to divide the opinions by specific judges. The Court and the other associate kept up the laborious data collection even when the Court and the other associate started their own firm. The Court and its firm would cite, quote, and discuss the opinions of the local federal judges back to them in its briefing.

If the Court went to this much travail to locate all the opinions of the judge before whom it was appearing, imagine what it thinks when it receives a brief citing, discussing, or quoting other courts' opinions on topics on which the Court has written, sometimes extensively and exhaustively. In contrast to the paper world in which the Court lived in the early and mid-1980s, all an associate has to do with Lexis and Westlaw is put in the judge's name and the subject to be researched. With research by judge and topic so easy today, there is no excuse for a lawyer not to know the opinion of the judge before whom they are practicing.

**(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[54]  Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist

---

[54]Rule 702's most prominent hurdle is the sufficiency of basis.  Yet the judiciary's uncomfortableness with analyzing an opinion's basis can be seen in the conflict in the cases.  The current conflict is whether the questions of sufficiency of basis, and of application of principles and methods, are matters of weight or admissibility.  Compare Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 255 (2d Cir. 2005)("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." (quoted in David E. Bernstein & Eric G. Lasker, Defending Daubert: It's Time to Amend Federal Rule of Evidence 702, 57 Wm. & Mary L. Rev. 1, 32 (2015)), with Milward v. Acuity Speciality Prods. Grp. 639 F.3d 11, 22 (1st Cir. 2011)("[T]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." (quoted in Bernstein & Lasker, supra, at 33).  There should not be a conflict.  Rule 702 states that these are questions of admissibility.  Yet many courts treat them as questions of weight.  See, e.g., Bernstein & Lasker, supra, at 33 (citing several Courts of Appeals that instruct district courts to consider the sufficiency of basis and/or application of the methodology as questions of weight).

What is most interesting is what the divergence from Supreme Court precedent and rule 702 suggest.  The divergence suggests that Daubert and rule 702 are too academic.  Daubert and rule 702 write better than they work in the courtroom and in practice.  Lower courts continue -- rightfully so -- to be uncomfortable with deciding these issues with the Sixth and Seventh Amendments to the Constitution of the United States protecting the right to jury trials in civil and criminal cases.  Cf. Bernstein & Lasker, supra, at 33 ("[C]ourts have held that '[t]he district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.'" (quoting Manpower, Inc. v. Ins. of Pa., 732 F.3d 796, 806 (7th Cir.)); Ronald J. Allen, Esfand Fafisi, Daubert and Its Discontents, Brooklyn L.R., 131, 147 (2010)(describing an argument for Daubert's unconstitutionality under the Seventh Amendment).

The Court is concerned that the federal courts will overreact to the wayward opinions that have created a split whether sufficiency of basis and application of methods is for the court or goes to the evidence's weight.  The Court is concerned that the federal courts are going in the direction of new rules.  There is a built-in institutional bias towards more rules and amendments.  The Judicial Conference runs the federal judiciary through committees.  See About the Judicial Conference, U.S. Cts., https://www.uscourts.gov/about-federal-courts/governance-judicial-conference/about-judicial-conference (last visited Jan. 5, 2019)("The Conference operates through a network of committees . . . ").  The Judicial Conference has a Standing Committee on Rules.

the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d

1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702

advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only

experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the

large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land

values."). An expert is "required to possess such skill, experience or knowledge in that particular

field as to make it appear that his opinion would rest on substantial foundation and would tend to

aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917,

928 (10th Cir. 2004). In United States v. Goxcon-Chagal, 886 F. Supp. 2d 1222, 1239 (D.N.M.

2012)(Browning, J.), the Court identified as relevant, and admitted, testimony on:

> (ii) the likelihood that a drug organization would entrust individuals outside of the organization with a large amount of drugs; (iii) the significance of the presence of multiple cellular telephones in the vehicle; (iv) the significance of the possession of multiple license plates; (v) the separation of individuals who package drugs and individuals who are drug couriers within a drug organization; (vi) the significance of the presence of multiple air fresheners in the vehicle; and (vii) the significance of the presence of a firearm in the vehicle.

---

The Standing Committee has five Advisory Committees: (i) Civil Procedure; (ii) Criminal Procedure; (iii) Evidence; (iv) Bankruptcy; and (v) Appellate. See How the Rulemaking Process Works, U.S. Cts., https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works (last visited Jan. 5, 2019). Each of these advisory committees has a reporter, almost always a prominent professor. See Overview for the Bench, Bar, and Public, U.S. Cts., https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works/overview-bench-bar-and-public (last visited Jan. 5, 2019). The reporter position is more prestigious if the reporter can get new rules promulgated; they have to justify their existence. There is thus a very smart, likeable, and liked person putting pressure on the committee to amend the rules. While judges are more conservative about promulgating new rules, they too often succumb to the reporter's pressure. The result is that the federal judiciary and the bar gets a host of new rules almost every year. The development of new rules burdens the federal judiciary and the bar -- all of which are overworked -- with mandatory changes each year, often constituting little more than stylistic changes. Everyone has to get new rule books every year. The burden of new rules often does not justify the meager benefits of the changes.

886 Supp. 2d at 1239. The Court did not admit testimony on whether a highway portion was a "drug route," because the "proposed testimony is too close to characterizing 'nearly any trip down the interstate' as traveling in a known drug route." United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1247. See United States v. Harry, 20 F. Supp. 3d 1196, 1243 (D.N.M. 2014)(Browning, J.)(deeming inadmissible testimony on a sex crime victim's demeanor during an examination, because "demeanor is not always a reliable indicator whether someone is telling the truth, especially about sex -- then no expert testimony is needed. That knowledge is well within the knowledge of jurors and most people."); United States v. Rodella, No. CR 14-2783 JB, 2014 WL 6634310, at *25 (D.N.M. Nov. 19, 2014)(Browning, J.)(stating that "testimony regarding nationally accepted police standards is irrelevant" to issues of "excessive force and" reasonableness). The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.[55]

---

[55]The Court is clipping the wings of experts all the time. See, e.g., Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d at 1204 (precluding an expert from discussing class certification requirements, but allowing the expert to testify to information about royalty instruments); United States v. Rodriguez, 125 F. Supp. 3d at 1255-56 (permitting an expert to describe a cartel's structure and organization, and to explain drug running, but not admitting the expert's testimony opining that the defendant was running drugs); Montoya v. Sheldon, 286 F.R.D. at 619 (precluding a treating physician from testifying about a party's post-traumatic stress disorder diagnosis, opinions about the causes for a party's symptoms, or a party's prognosis). Attorneys ask experts to do too much, and experts try to do too much. The experts are being paid; they are trying to be helpful to the attorney. Cf. Mark I. Bernstein, Jury Evaluation of Expert Testimony Under the Federal Rules, Drexel L.R. 239, 268 (2015)("Any use of expert witnesses paid by a party raises concerns of partisanship, competency, and honesty. Because experts are partisan witnesses paid by a party, there is an inevitable danger of bias."). The experts will often do anything. They toss statements into their reports to be helpful. Too many attorneys release the report as written -- without editing and without trimming. This failure to edit and to trim creates unnecessary litigation. Many expert reports contain statements that the proponent attorney does not need or even want. The reports draw Daubert motions or rule 702 challenges. The proponent is then forced to defend the statements that he or she does not even need or want.

See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d at 1266 (citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).  Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications."  Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted).  See United States v. Rodella, 2014 WL 6634310, at *20 ("Because of [the proposed expert's] lack of practical experience, lack of nationwide experience, and lack of an advanced degree in criminology or law enforcement, [the proposed expert] is not qualified to testify about nationally accepted police procedures and practices."); United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1245 (determining an expert qualified to testify to drug trafficking when he had personal knowledge of the subject from working in the Drug Enforcement Agency for almost fifteen years).

Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").  "The Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness."  United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1214 (D.N.M. 2011)(Browning, J.)(citing United States v. Benally, 541 F.3d 990, 996 (10th Cir. 2008)).  "The Tenth Circuit may draw this distinction because, generally, it is the jury's exclusive function to make credibility determinations . . . whereas a court makes a

pretrial determination of the constitutional voluntariness of a statement."  United States v. Ganadonegro, 805 F. Supp. 2d at 1214 (citation omitted)(citing United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)).

### 2.    The Standard in Daubert.

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact.  See Daubert, 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).[56]  The

---

[56]The current law -- and its trajectory -- are casting serious shadows over using expensive experts.  This reality is particularly true in cases involving jury trials.  It is probably a good time for the judiciary to rethink expert testimony rather than continuing with the current regime and making incremental changes.

Lawyers and appellate courts overemphasize the importance of experts and distrust juries.  See Sanja Kutnjak Ivkovic & Valerie P. Hans, Jurors' Evaluations of Expert Testimony: Judging the Messenger and the Message, 28 Law & Soc. Inquiry 441, 442 (2003)("One key assumption underlying the Daubert line of cases is that jurors might be duped by a persuasive but untrustworthy expert who testifies about matters that are not based on sound scientific principles or data.").  Cf., Elaine E. Sutherland, Undue Deference to Experts Syndrome?, 16 Ind. Int'l & Comp. L. Rev. 375, 382 (2006)("[I]f one is coming from a position of ignorance, the person who holds the key to that certain body of knowledge is something of a savior.  The danger . . . is that this empowerment of the expert witness will result in undue deference to his or her opinion.").  Appellate judges often do not have extensive or any trial experience, particularly as Presidents want to rule from the grave, and appoint younger and younger appellate judges, who often -- because of their years -- have not spent a lot of time trying cases in the courtroom before juries.  Academics, corporate lawyers, general counsel, and appellate judges -- without considerable courtroom experience -- think that experts will easily mislead juries.  Yet, the Court talks regularly to juries after jury trials, and the Court listens to trial lawyers talking to juries after jury trials.  Juries often expressly state that they disregarded the parties' experts.  The Court often hears comments like the "expert was arrogant and/or incomprehensible."

Part of the problem is that academics and, often, appellate jurists do not appreciate or understand modern American jurors.  Jurors have become very independent, and do not take direction well or easily from anyone -- the judge, lawyers, or experts.  The days of dressing up for

Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.[57] See Daubert, 509 U.S. at 594-95. The district court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly

---

court in coats and ties, and doing what the judge tells them to do are fading. Jurors question everything. If the Court tells them to go in one door, they want to use another. Whereas jurors used to compliment the Court's jury instructions as giving a roadmap to the jurors' decisions, jurors now criticize even the uniform or pattern jury instructions. Modern American jurors do not like to think that they are being told what to do. And they certainly do not like experts telling them what to do; modern American jurors do not like the idea of "experts" who are smarter than they are.

At the same time that modern American jurors are showing more independence, paternalistic Daubert hearings have proliferated. This phenomenon raises many concerns. One concern is the sheer prevalence of Daubert motions. Cf. Cynthia Lynne Pike, The Impact of Revised MRE [sic] 702 and 703 in Response to Daubert, 52 Wayne L. Rev. 285, 301 (2006)(describing the effects of a state-specific rule resembling rule 702 and stating: "One of the more important tactical strategies in dealing with the court's role as gatekeeper under the new MRE 702 is the use of motions in limine and other pretrial evidentiary hearings."). Motions to dismiss, class certification motions, motions for summary judgment, sentencings, and competency hearings -- in addition to testimony -- now require Daubert hearings. The costs of Daubert motions, to the court and the parties, is staggering. The time-consuming nature of Daubert motions is overwhelming.

[57]Federal courts are obsessed with reliability problems. This idea pops up several places and in several ways, creating multiple grounds upon which the court has the power to exclude the expert. See Admissibility of Scientific Evidence, SJ081 ALI-ABA 1 , 27 (noting that courts treat the "assist the trier of fact" requirement for expert testimony as a relevancy requirement and stating that rule 401 already requires evidence to be relevant).

relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649, at *3

(citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The Tenth Circuit stated the applicable

standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . .).  This obligation involves a two-part inquiry.  Id.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'"  Id.  (quoting Daubert, 509 U.S. at 592 . . .).  In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ."  Id. (quoting Daubert, 509 U.S. at 592-93 . . .).  Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand." Daubert, 509 U.S. at 597 . . . .

397 F.3d at 883-84 (footnote omitted).  "The second inquiry is related to the first.  Under the

relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony

logically advances a material aspect of the case. . . .  The evidence must have a valid scientific

connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp., 397 F.3d at 884

n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand

from the Supreme Court); Daubert, 509 U.S. at 591).  If the expert's proffered testimony fails on

the first prong, the court does not reach the second prong.  See Norris v. Baxter Healthcare Corp.,

397 F.3d at 884.  In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court

expanded the rules under Daubert to non-scientific expert testimony.  See Kumho Tire Co. v.

Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial

judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific'

knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."

(quoting Carmichael v. Samyang Tires, Inc., 923 F. Supp. 1514, 1521 (S.D. Ala. 1996)).  The

Supreme Court recognized in <u>Kumho Tire Co. v. Carmichael</u> that the factors from <u>Daubert</u> will not apply to all cases:

> Our emphasis on the word "may" thus reflects <u>Daubert</u>'s description of the Rule 702 inquiry as a flexible one. Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test. And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

<u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under <u>Daubert</u>, a court must focus generally on "principles and methodologies, and not on the conclusions generated." <u>Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC</u>, No. CIV 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing <u>Daubert</u>, 509 U.S. at 595). "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC</u>, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted)(quoting <u>Dodge v. Cotter Corp.</u>, 328 F.3d at 1222). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology which he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury. <u>See</u> <u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d at 881. The Tenth Circuit noted in <u>Hollander v. Sandoz Pharmaceutical Corp.</u>, 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under <u>Daubert</u>, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the <u>Daubert</u> manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, <u>Daubert</u>'s effort to safeguard the reliability of

science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206.  The United States Court of Appeals for the Ninth Circuit noted in <u>Claar v. Burlington Northern Railroad</u>, 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method.  Certainly, scientists may form initial tentative hypotheses.  However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact.  In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

<u>Ram v. N.M. Dep't of Env't</u>, No. CIV 05-1083, 2006 WL 4079623, at *10 (D.N.M. Dec. 15, 2006)(Browning, J.)(citing <u>United States v. Rodriguez-Felix</u>, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion. <u>See</u> <u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); <u>In re Breast Implant Litig.</u>, 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  The court may conclude that there is simply too great an

analytical gap between the data and the opinion proffered."  Gen. Elec. Co. v. Joiner, 522 U.S. at

146.  See Hollander v. Sandoz Pharm. Corp., 289 F.3d at 1209 (noting a lack of similarity between

animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D.

Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same

reaction in humans.").  Courts have excluded experts' opinions when the experts depart from their

own established standards.  See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th

Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire

investigation [which the expert] himself professed he adhered to."); Magdaleno v. Burlington

N.R.R., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology

is not consistent with the methodologies described by the authors and experts whom [the expert]

identifies as key authorities in his field.").

> **3.**      **Necessity of Evaluating an Issue Under Daubert.**

The restrictions in Daubert apply to both "novel" expert testimony and "well-established

propositions."  509 U.S. at 593 n.11 ("Although the Frye[58] decision itself focused exclusively on

'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or

exclusively to unconventional evidence.").   "Of course, well-established propositions are less

likely to be challenged than those that are novel, and they are more handily defended."  Daubert,

509 U.S. at 593 n.11.  "Indeed, theories that are so firmly established as to have attained the status

---

[58]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal
Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the
deduction is made must be sufficiently established to have gained general acceptance in the
particular field in which it belongs."  293 F. at 1014.

of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert, 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology,[59] and in fact some courts have indicated their acceptance of it.").[60]

_____

[59]PCR, a "[p]olymerase chain reaction," Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780, is a widely used method for copying DNA segments, Polymerase Chain Reaction, Wikipedia, https://en.wikipedia.org/wiki/Polymerase_chain_reaction (last visited Nov. 28, 2018).

[60]Much of the focus of current debate about experts is on forensic evidence, which comes in many forms. The challenge to forensic evidence comes from two areas: (i) the federal courts; and (ii) the scientific community. The reports of the National Academies of Science ("NAS") and the President's Council of Advisors on Science and Technology ("PCAST") raise challenges to the reliability of forensic methods. See Executive Office of the President, President's Council of Advisors on Science and Technology, Report to the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (Sept. 2016); Committee on Identifying the Needs of the Forensic Sciences Community, National Research Council, Strengthening Forensics Science in the United States: A Path Forward (July 2009). There is increasing skepticism of the legal profession's most cherished evidence, including fingerprints, DNA, firearms, and breath tests. See, e.g., President's Council of Advisors on Science and Technology, supra, at 67-110; Committee on Identifying the Needs of the Forensic Sciences Community, supra, at 42-48.
    The Court is concerned that the federal judiciary is moving toward a freestanding rule on forensic evidence. The Court is not a big fan of addressing the topic of forensic evidence through rulemaking. No rule, procedures manual, or note is needed to tell judges that there is no certainty with forensic opinions. There is also no reasonable degree of certainty. These opinions are now considered overstated: in the old days -- like last week -- attorneys would routinely ask: "Doctor,

# EXPERT TESTIMONY ON ULTIMATE ISSUES

Rule 704 of the Federal Rules of Evidence states:

**(a) In General -- Not Automatically Objectionable.** An opinion is not objectionable just because it embraces an ultimate issue.

**(b) Exception.** In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes

---

is it your opinion, to a reasonable degree of certainty, that the plaintiff's appendix was on the left side of the body?" Experts should no longer testify in this fashion.

The nation does not need another rule. An examination of Article VII -- Opinions and Expert Testimony -- shows six rules: (i) rule 701 -- Opinion Testimony by Lay Witnesses; (ii) rule 702 -- Testimony by Expert Witnesses; (iii) rule 703 -- Bases of an Expert's Opinion Testimony; (iv) rule 704 -- Opinion on an Ultimate Issue; (v) rule 705 -- Disclosing the Facts or Data Underlying an Expert's Opinion; and (vi) rule 706 -- Court-Appointed Expert Witnesses (a bad idea in about all cases). See Fed. R. Evid. 701-06. If the reporter would drop rule 706, perhaps there would be room for a rule pertaining to forensic evidence.

The Court is concerned what a new rule would look like. The judiciary could make its point in a committee note, but without a new rule, there is no need for a new note. The PCAST report does not propose a change to the Evidence Rules. Rather, PCAST proposes a best procedures manual. See President's Council of Advisors on Science and Technology, supra, at 145. It would be better if legal leaders do like Duke University School of Law has done for class actions and the Sedona Conference has done for electronic discovery. See Class-Action Settlement Conference, Duke Law, https://law.duke.edu/judicialstudies/conferences/oct2016/ (last visited Jan. 7, 2019); The Sedona Conference Working Group Series, The Sedona Conference, https://thesedonaconference.org/wgs (last visited Jan. 7, 2019). Rather than a new rule or note, the Court believes that a best practices manual -- prepared by professional leaders who come together to write -- and not the judiciary -- would be the better approach.

The Court expects several difficulties with a new rule. The first difficulty with any rule on forensic evidence will be determining to whom it should apply. A new rule would presumably apply to forensic witnesses' testimony. Such witnesses include people testifying about evidence through scientific means, by comparing patterns, or by "scientific or technical." Evidence at 637, Black's Law Dictionary (9th ed. 2009). After the Court and the bar have identified the universe of experts to whom the rule applies or the best practices apply, the new rules' requirements must be determined. An expert must already satisfy all of rule 702's requirements. Under a new rule, the expert will also need to satisfy all of the new requirements. With more hurdles, the chances of exclusion or limiting are enhanced. Rule 702's requirements, however, are enough, and the law should not require more.

> an element of the crime charged or of a defense.  Those matters are for the trier of
> fact alone.

Fed. R. Evid. 704.  "Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact."  Vondrak v. City of Las Cruces, No. CIV 05-0172 JB/LAM, 2009 WL 3241555, at *10 (D.N.M. Aug. 25, 2009)(Browning, J.).  "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury."  Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10 (quoting 1 K. Broun, McCormick on Evidence § 12 (6th ed. 2006 update)).  The Federal Rules of Evidence reflect that the ultimate-issue rule has been abolished.  See United States v. Smith, 156 F.3d 1046, 1054 (10th Cir. 1998).[61] Although rule 704(a) permits an expert to testify about areas that embrace an ultimate issue, there are some other limitations, aside from those that rule 704(b) expresses, regarding testimony on ultimate issues.  More specifically, the Tenth Circuit has stated: "[A]n expert may not state legal

---

[61]It is true that rule 702 allows experts to offer an opinion on an ultimate issue.  The question is why anyone would want to have an expert opine on an ultimate issue.  This spoon-feeding insults jurors.  Jurors do not like that testimony.  Yet, attorneys will fight hard for their experts to offer an opinion on an ultimate issue.  The lawyer should avoid telling jurors what to do: rather, give them the tools to make their own decisions.  The best lawyers are the ones who lead juries to the water but do not make them drink.  The most effective lawyers leave something for the jury to do.  Juries like to think that the resolution of the ultimate issue is their idea.  The jurors will also like the proponent lawyer better.  The jurors will like the expert better.  The proponent's lawyer and party will have a more effective presentation.

The only situations in which the Court can foresee a benefit from an expert opining on an ultimate issue are those wherein the law requires an expert opinion.  Medical malpractice suits, for instance, may present such circumstances.  The Court has likewise encountered such a case where the State of New Mexico required expert testimony in cases in which an average person's ordinary common knowledge could not determine an issue, such as causation.  See Am. Mech. Sols., L.L.C. v. Northland Process Piping, Inc., 184 F. Supp. 3d at 1067.  In these situations, a proponent may risk dismissal or a directed verdict if the expert does not opine on the ultimate issue.

conclusions drawn by applying the law to the facts." A.E. by & Through Evans v. Indep. Sch. Dist. No. 25, of Adair Cty., 936 F.2d 472, 476 (10th Cir. 1991).

"Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state; it does not prevent an expert from testifying to facts or opinions from which the jury could conclude or infer that the defendant had the requisite mental state." United States v. Ganadonegro, No. CR 09-0312 JB, 2012 WL 592170, at *5 (D.N.M. Feb. 17, 2012)(Browning, J.)(citing United States v. Torres, 53 F.3d 1129, 1141-42 (10th Cir. 1995)). The restrictions in rule 704(b) do not apply to lay witnesses, see United States v. Goodman, 633 F.3d 963, 968 (10th Cir. 2011), although the lay witnesses' testimony must still be helpful to the trier of fact to satisfy rule 701, see Fed. R. Evid. 701(b). "[Rules 701, 702, and 403] afford ample assurances against the admission of opinions [under rule 704] which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day." United States v. Barile, 286 F.3d 749, 759-60 (4th Cir. 2002). Pursuant to rule 704, it is a court's task "to distinguish [helpful] opinion testimony that embraces an ultimate fact from [unhelpful] opinion testimony that states a legal conclusion." United States v. Perkins, 470 F.3d 150, 158 (4th Cir. 2006)(internal quotation marks omitted)(quoting United States v. Barile, 286 F.3d at 760). In making that determination, a court should consider whether the question tracks the language of the legal principle or statute at issue, and then consider whether any terms employed have a specialized legal meaning. See United States v. Perkins, 470 F.3d at 158. The Court has addressed this issue in various contexts. See, e.g., SEC v. Goldstone, No. CIV 12-0257 JB/LFG, 2016 WL 3135651, at *1, *44 (D.N.M. May 10, 2016)(Browning, J.)(internal quotation marks omitted)(prohibiting, in a case involving a Form 10-K's allegedly "fraudulent misrepresentations and omissions," expert

testimony on whether the defendants' actions were "reasonable" or "certain information" disclosed was "material," and distinguishing the case from Tenth Circuit decisions in which "[t]he issues . . . were far simpler and subject to easy determination by a single expert . . . ."); United States v. Rodella, 2014 WL 6634310, at *29 (rejecting expert testimony as on an ultimate issue when the United States introduced the expert to testify to whether an officer "acted reasonably or violated the Constitution"); United States v. Gould, No. CR 03-2274 JB, 2007 WL 1302596, at *4 (D.N.M. March 17, 2007)(Browning, J.)("The Tenth Circuit has indicated in recent opinions that, in the 42 U.S.C. § 1983 context, the jury cannot use law enforcement policies and standards to inform the debate whether a civil rights violation has occurred." (citing Tanberg v. Sholtis, 401 F.3d 1151, 1163-64 (10th Cir. 2005); Marquez v. City of Albuquerque, 399 F.3d 1216, 1222 (10th Cir. 2005); Chamberlin v. City of Albuquerque, No. CIV 02-0603, 2005 WL 2313527 (D.N.M. July 31, 2005)(Browning, J.))).

## RELEVANT LAW REGARDING THE ADA

The ADA generally prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. "'Discrimination' as used in the ADA encompasses" several variations. Davidson v. Am. Online, Inc., 337 F.3d at 1188. First, it means a failure to provide qualified individuals with reasonable accommodations, see Davidson v. Am. Online, Inc., 337 F.3d at 1188-89, because the ADA makes unlawful: "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" and "denying employment opportunities to a job applicant or employee who is an otherwise

qualified individual with a disability," 42 U.S.C. § 12112. Second, it includes disparate treatment, i.e., an individual being treated "differently because of the disability." Davidson v. Am. Online, Inc., 337 F.3d at 1188. Third, it embraces disparate impacts: "[U]nder a disparate impact theory, discrimination is defined as including the use of 'qualification standards . . . or other selection criteria that screen out or tend to screen out an individual with a disability . . . .'" Davidson v. Am. Online, Inc., 337 F.3d at 1189 (quoting 42 U.S.C. § 12112(b)(6)). Fourth, it encompasses certain medical examinations and inquiries. See 42 U.S.C. § 12112(d)(1). The ADA additionally makes unlawful retaliation, i.e., "discrimination against any individual 'because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act.'" Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1131 (10th Cir. 2010)(quoting 42 U.S.C. § 12203(a)).

1.    **Prima Facie Case of Failure to Accommodate.**

The ADA requires that employers make reasonable accommodations for disabled employees. See 42 U.S.C. § 12112. The Tenth Circuit has established a three-part prima facie test for failure-to-accommodate claims. See Punt v. Kelly Servs., 862 F.3d at 1050. An employee must show: "(1) she is disabled; (2) she is 'otherwise qualified'; and (3) she requested a plausibly reasonable accommodation." Punt v. Kelly Servs., 862 F.3d at 1050 quoting Sanchez v. Vilsack, 695 F.3d 1174, 1177 (10th Cir. 2012)). "Establishing a prima facie case is 'not onerous,' and 'summary adjudication may be improper when the employee has presented evidence she could perform the essential functions of her position' with the aid of an accommodation." Osborne v. Baxter Healthcare Corp., 798 F.3d 1260, 1266 (10th Cir. 2015)(first quoting Hawkins v. Schwan's

- 74 -

Home Serv., Inc., 778 F.3d 877, 883 (10th Cir. 2015), and then quoting Mason v. Avaya Commc'ns Inc., 357 F.3d 1114, 1124 (10th Cir. 2004)).  A failure to accommodate claim does not require evidence of an intent to discriminate.  See Punt v. Kelly Servs., 862 F.3d at 1048.

> Unlike other enumerated constructions of "discriminate," this construction does not require that an employer's action be motivated by a discriminatory animus directed at the disability.  Rather, any failure to provide reasonable accommodations for a disability is necessarily "because of a disability" -- the accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability -- and no proof of a particularized discriminatory animus is exigible.

Punt v. Kelly Servs., 862 F.3d at 1048 (quoting Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999)).  If an employee makes the requisite showing, an employer may present evidence: "(1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer."  Punt v. Kelly Servs., 862 F.3d at 1050 (quoting Smith v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d 1154, 1179 (10th Cir. 1999)).

The ADA defines "qualified individual" as "an individual who . . . can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 1211(8).  An individual is qualified if a reasonable accommodation enables him or her to perform essential functions.  See Valdez v. McGill, 462 F. App'x at 817 (taking the qualified-individual analysis in two parts: (i) "determine whether the individual can perform the essential functions of the job"; and (ii) "determine whether any reasonable accommodation by the employer would enable him to perform those functions." (quoting Davidson v. Am. Online, 337 F.3d at 1190)).  "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential."  42 U.S.C. § 1211(8).  "Essential functions of the job [are] functions that bear more than a marginal relationship to the job at issue."  Adair v. City of Muskogee, 823 F.3d 1297, 1307

(10th Cir. 2016)(internal quotation marks omitted)(quoting Hawkins v. Schwan's Home Serv., Inc., 778 F.3d at 887). To determine if a function is essential, the Tenth Circuit considers,

> among other things, (1) the employer's judgment as to which functions are essential; (2) written job descriptions; (3) the time spent performing the particular function; (4) the consequences if the individual cannot perform the function; (5) any collective-bargaining agreement; (6) the work experience of those in the position in the past; and (7) the current work experience of those in similar positions.

Adair v. City of Muskogee, 823 F.3d at 1307 (citing 29 C.F.R. § 1630.2(n)(3)).

"Whether an accommodation is reasonable under the ADA is a mixed question of law and fact." Mason v. Avaya Commc'ns, Inc., 357 F.3d at 1122 (citing Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 967 (10th Cir. 2002)). To establish that an accommodation is reasonable, "the employee 'need only show that an accommodation seems reasonable on its face, i.e., ordinarily or in the run of cases.'" Osborne v. Baxter Healthcare Corp., 798 F.3d at 1267 (quoting U.S. Airways v. Barnett, 535 U.S. 391, 401 (2002)). "A proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue." Osborne v. Baxter Healthcare Corp., 798 F.3d at 1267 (citing 29 C.F.R. § 1630.2(o)(1)(ii); Hennagir v. Utah Dep't of Corr., 587 F.3d 1255, 1264 (10th Cir. 2009)). "A reasonable accommodation 'may include . . . job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations." Valdez v. McGill, 462 F. App'x at 817 (quoting 42 U.S.C. § 12111(9)). "[A]n employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." Mason v. Avaya Commc'ns, Inc., 357 F.3d at 1122.

"To facilitate the reasonable accommodation, [t]he federal regulations implementing the ADA envision an interactive process that requires participation by both parties." EEOC v. C.R. England, Inc., 644 F.3d 1028, 1049 (10th Cir. 2011)(internal quotation marks omitted)(quoting Bartee v. Michelin N. Am., Inc., 374 F.3d 906, 916 (10th Cir. 2004)(alteration in original), and citing 29 C.F.R. § 1630.2(o)(3)). See Valdez v. McGill, 462 F. App'x at 819 ("An employer must make a reasonable effort to explore the accommodation possibilities with the employee."). Although "[t]he interactive process is typically an essential component of the process by which a reasonable accommodation can be determined," Smith v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d at 1172, the failure to engage in an interactive process does not form the basis for an independent claim, see Valdez v. McGill, 462 F. App'x at 819; Smith v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d at 1174. The employer has no duty to engage in an interactive process when the plaintiff is not qualified and/or a reasonable accommodation is not possible. See Valdez v. McGill, 462 F. App'x at 819 (noting that where no reasonable accommodation is possible, the employer need not engage in a "futile interactive process"); Smith v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d at 1174. "[T]he employer . . . must make a threshold determination that the disabled employee may be accommodated, and is . . . qualified within the meaning of the ADA." White v. York Int'l Corp., 45 F.3d 357, 363 (10th Cir. 1995). See Woodman v. Runyon, 132 F.3d 1330, 1345 (10th Cir. 1997)(describing that a plaintiff should must "ma[k]e a facial showing that reasonable accommodation . . . is plausible").[62] See also Mason v.

_____

[62]Woodman v. Runyon is a Rehabilitation Act, 29 U.S.C. §§ 701-18, 720-28, 728a, 730-33, 741, 751, 760-62, 762a, 763-66, 771-73, 776, 780-85, 790-94, 794a-94e, 794g, 795g-95o, 796, 796-1, 796a-96d, 79d-1, 796e, 796e-0 to 96e-3, 796f, 796f-1 to 96f-6, 796j, 796j-1, 796k, 796, case, but "[c]ases decided under section 504 of the Rehabilitation Act are . . . applicable to cases

Avaya Commc'ns, Inc., 357 F.3d at 1118-1124 & 1124 n.4 (concluding that, where a service coordinator suffering from post-traumatic stress disorder and unable to physically attend work was not a qualified individual and her request to work from home was not a request for a reasonable accommodation, the employer had no duty to engage in an interactive process).

The plaintiff also must have triggered the interactive process by notifying the employer both of the hardship and of the desire for an accommodation. See EEOC v. C.R. England, Inc., 644 F.3d at 1049.

> [T]he interactive process must ordinarily begin with the employee providing notice to the employer of the employee's disability and any resulting limitations, and expressing a desire for reassignment if no reasonable accommodation is possible in the employee's existing job. The employee should provide enough information about his or her limitations and desires so as to suggest at least the possibility that reasonable accommodation may be found in a reassignment job within the company.

Smith v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d at 1171-72 (footnote and citation omitted)(citing Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996)).

### 2.    Prima Facie Case of Disparate Treatment.

> To establish a prima facie case of discrimination under the ADA, a plaintiff must show "(1) that he is disabled within the meaning of the ADA; (2) that he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) that he was discriminated against because of his disability."

Davidson v. Am. Online, Inc., 337 F.3d at 1188 (quoting McKenzie v. Dovala, 242 F.3d 967, 969 (10th Cir. 2001)). The analysis for whether an individual is qualified is the same as the analysis under a failure-to-accommodate claim. See Davidson v. Am. Online, Inc., 337 F.3d at 1188. "In

---

brought under the ADA and vice versa, except to the extent the ADA expressly states otherwise." Winston v. Ross, 725 F. App'x 659, 663 (10th Cir. 2018)(quoting Woodman v. Runyon, 132 F.3d at 1339 n.8).

order to demonstrate 'discrimination,' a plaintiff generally must show that he has suffered an 'adverse employment action because of the disability.'" EEOC v. C.R. England, Inc., 644 F.3d at 1038 (quoting Mathews v. Denver Post, 263 F.3d 1164, 1167 (10th Cir. 2001)). Adverse employment actions include "acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Dick v. Phone Directories Co., 397 F.3d 1256, 1268 (10th Cir. 2005). To establish the "because of the disability" part of the third element, the plaintiff must establish a discriminatory intent. See Davidson v. Am. Online, Inc., 337 F.3d at 1188.

### 3.    Prima Facie Case of Retaliation.

A prima facie case of retaliation requires that the plaintiff demonstrate: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202 (footnote omitted). A plaintiff alleging retaliation does not need to establish that he or she meets the statute's definition of disabled; rather, the plaintiff's "reasonable, good-faith belief that the statute has been violated suffices." Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1264 (10th Cir. 2001). "Protected activity" refers to activity that the statute protects, such as filing an EEOC claim or other administrative charges. See Proctor v. United Parcel Serv., 502 F.3d 1200, 1208 (10th Cir. 2007). An adverse employment action "must be 'materially adverse' to the employee's job status. The adverse action must amount to 'a significant change in employment status, such as firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits.'" Meiners v. Univ. of Kan., 359 F.3d 1222, 1230 (10th Cir. 2004)(citation omitted)(first quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 533, and then quoting Aquilino v. Univ. of Kan., 268 F.3d 930, 934 (10th Cir. 2001)). The causal-connection element incorporates an analysis of motive. See Proctor v. United Parcel Serv., 502 F.3d at 1207-08. Close temporal proximity between the protected activity and the adverse action "is sufficient to allow an inference [of] a causal connection" between them. Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202 (allowing such inference where there were twenty-four days between the protected activity and adverse action (citing Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999)(noting that a six-week period establishes this rebuttable inference but a three-month period does not)).

### 4. **Evidence of Intent.**

For many forms of discrimination claims, a plaintiff must support his or her case with either direct or circumstantial evidence of intent. See Proctor v. United Parcel Serv., 502 F.3d at 1207-08; Davidson v. Am. Online, Inc., 337 F.3d at 1189. For disparate treatment and disparate impact claims, "[b]ecause the statute only prohibits discrimination 'on the basis of disability,'" to meet the "discrimination" element, "there must be a nexus between the disability and the adverse employment action." Punt v. Kelly Servs., 862 F.3d at 1048. For retaliation claims, a plaintiff must establish "an inference of retaliatory motive," Proctor v. United Parcel Serv., 502 F.3d at 1208 (internal quotation marks omitted)(quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1228 (10th Cir. 2006)), "[t]o establish that a causal connection exists between" the protected activity and adverse action, Proctor v. United Parcel Serv., 502 F.3d at 1208.

### a. __Direct Evidence of Discrimination.__

"Direct evidence is '[e]vidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption.'"  Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1207 (10th Cir. 1999)(alterations in Shorter v. ICG Holdings, Inc.)(quoting Black's Law Dictionary 460 (6th ed. 1990)).  Moreover, "[d]irect evidence demonstrates on its face that the employment decision was reached for discriminatory reasons."  Danville v. Reg'l Lab Corp., 292 F.3d 1246, 1249 (10th Cir. 2002).  "A statement that can plausibly be interpreted two different ways -- one discriminatory and the other benign -- does not directly reflect illegal animus, and, thus, does not constitute direct evidence."  Hall v. U.S. Dep't of Labor, Admin. Review Bd., 476 F.3d 847, 855 (10th Cir. 2007)(internal quotation marks omitted)(quoting Patten v. Wal-Mart Stores E., Inc., 300 F.3d 21, 25 (1st Cir. 2002)).  "When a plaintiff alleges that discriminatory comments constitute direct evidence of discrimination, . . . the plaintiff 'must demonstrate a nexus exists between [the] allegedly discriminatory statements and the . . . decision to terminate her.'"  Perry v. Woodward, 199 F.3d 1126, 1134 (10th Cir. 1999)(alteration in Perry v. Woodward)(quoting Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir. 1994)).  "Direct evidence is that which demonstrates 'a specific link between the alleged discriminatory animus and the challenged [employment] decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated [the employer's] decision' to take the adverse employment action."  Deneen v. Nw. Airlines, Inc., 132 F.3d 431, 436 (8th Cir. 1998)(alterations in Deneen v. Nw. Airlines, Inc.)(quoting Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997)). "Statements of personal opinion, even when reflecting personal bias or prejudice, do not constitute direct evidence of discrimination, but at most, are only circumstantial evidence of discrimination

because the trier of fact must infer discriminatory intent from such statements." Hall v. U.S. Dep't of Labor, Admin. Review Bd., 476 F.3d at 855 (citing Shorter v. ICG Holdings, Inc., 188 F.3d at 1207).

### b. Burden-Shifting Under McDonnell Douglas.

In the absence of direct evidence, a plaintiff alleging discrimination may rely upon the burden-shifting framework that the Supreme Court, in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)("McDonnell Douglas"), provided. See, e.g., Pushkin v. Regents of Univ. of Colo., 658 F.2d 1372, 1387 (10th Cir. 1981). Under the McDonnell Douglas framework, once a plaintiff has made out a prima facie case, the burden shifts to the defendant to show either that "the plaintiff was not . . . otherwise qualified" or that there is a nondiscriminatory reason for the adverse action. Pushkin v. Regents of Univ. of Colo., 658 F.2d at 1387. See also Argo v. Blue Cross & Blue Shield of Kan., 452 F.3d at 1202; Mitchell v. City of Wichita, 140 F. App'x 767, 777 (10th Cir. 2005)(Browning, J.)(unpublished). "Upon the employer's articulation of legitimate, nondiscriminatory reasons, the presumption of discrimination established by the prima facie case 'simply drops out of the picture.'" Kelley v. City of Albuquerque, 375 F. Supp. 2d 1183, 1210 (D.N.M. 2004)(Browning, J.)(quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)). Further, "the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 509. "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon these beliefs." Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1318 (10th Cir. 1999), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,

536 U.S. 101 (2002).

Once the defendant produces a legitimate, nondiscriminatory explanation for the defendant's action, to survive summary judgment, the plaintiff must establish a genuine question of material fact whether the defendant's explanation is pretextual.  See Pushkin v. Regents of Univ. of Colo., 658 F.2d at 1387.  To establish a genuine issue of material fact as to pretext, a plaintiff must demonstrate that the defendant's "proffered non-discriminatory reason is unworthy of belief."  Randle v. City of Aurora, 69 F.3d 441, 453 (10th Cir. 1995).  To meet this standard, a plaintiff must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)(internal quotation marks omitted)(quoting Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951-52 (3d Cir. 1996)).  "If a plaintiff advances evidence upon which a factfinder could conclude that the defendant's allegedly nondiscriminatory reasons for the employment decisions are pretextual, the court should deny summary judgment."  Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1134.  "[A] plaintiff's prima facie case [of discrimination], combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).  Consequently, "once a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment."  Bryant

v. Farmers Ins. Exch., 432 F.3d 1114, 1125 (10th Cir. 2005).

> Debunking one of the employer's explanations defeats the case for summary judgment "only if the company has offered no other reason that, *if that reason stood alone* (more precisely if it did not have support from the tainted reason), would have caused the company to take the action of which the plaintiff is complaining."

Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1310 (10th Cir. 2005)(quoting and emphasis in

Russell v. Acme-Evans Co., 51 F.3d 64, 69 (7th Cir. 1995)).

### 5.     Preemployment Medical Inquiry Claims.

An employer "shall not conduct a medical examination or make inquiries of a job applicant

as to whether such applicant is an individual with a disability or as to the nature or severity of such

disability," 42 U.S.C. § 12112(d)(2)(A), unless the employer inquires "into the ability of an

applicant to perform job-related functions," 42 U.S.C § 12112(d)(2)(B).  This provision applies

regardless whether the applicant is disabled.  See Griffin v. Steeltek, Inc., 160 F.3d 591, 593 (10th

Cir. 1998).  The purpose of bringing such a claim is to prevent employers from inquiring into

whether employees have a disability, so requiring a plaintiff to identify as disabled as part of the

prima facie case "makes little sense."  Griffin v. Steeltek, Inc., 160 F.3d at 594.

"Compensatory damages are available . . . , however, only if the plaintiff establishes that

the employer not only technically violated § 12112(d)(2)(A) by asking a prohibited question, but

also that by doing so it actually 'engaged in unlawful intentional discrimination.'"  Griffin v.

Steeltek, Inc., 261 F.3d 1026, 1028-29 (10th Cir. 2001)(quoting 42 U.S.C. § 1981a(a)(2)).  The

Tenth Circuit has not elaborated on what a plaintiff must show to survive summary judgment on

or otherwise establish a § 12112(d) claim.  Other Courts of Appeals have more explicitly indicated

that a plaintiff must demonstrate an injury and causation.  See Tice v. Ctr. Area Transp. Auth., 247

F.3d 506, 519 (3d Cir. 2001)(holding that, to establish a claim on § 12112(d), a party must show

"the existence of an injury-in-fact, either through actual damage (emotional, pecuniary, or otherwise)"); Cossette v. Minn. Power & Light, 188 F.3d 964, 971 (8th Cir. 1999)("As we explained above, Cossette must establish a tangible injury caused by the alleged illegal disclosure" under § 12112(d)); Armstrong v. Turner Indus., Inc., 141 F.3d 554, 562 (5th Cir. 1998)("There must be some cognizable injury in fact of which the violation is a legal and proximate cause for damages to arise from a single violation.").

In the Court's view, the phrase "unlawful intentional discrimination" suggests an analysis parallel to disparate treatment, i.e., intentional discrimination claims, and pushes district courts to employ the same injury and causation analyses that they would for other discrimination claims. See Davidson v. Am. Online, Inc., 337 F.3d at 1188. To establish a prima facie case under § 12112(d)(2), a plaintiff must show that: (i) the employer violated § 12112(d)(2), and (ii) that the employer discriminated against the employee because of the § 12212(d)(2) violation.[63] To show discrimination, the plaintiff should establish that the employer subjected him or her to an adverse employment action, see EEOC v. C.R. England, Inc., 644 F.3d at 1038 (quoting Mathews v. Denver Post, 263 F.3d at 1167 (10th Cir. 2001)),[64] and acted with discriminatory intent, see Dick

---

[63]This test necessarily differs from that for a disparate-treatment case, because a plaintiff does not need to be a qualified individual with a disability to bring a claim under § 12112(d)(2). See Griffin v. Steeltek, Inc., 160 F.3d at 593.

[64]Courts diverge on whether injuries other than adverse employment may satisfy the injury requirement for § 12112(d)(2).

Some courts suggest that any "actual damage (emotional, pecuniary, or otherwise)" that a plaintiff suffers as the result of an illegal inquiry may be enough to maintain a § 12112(d) claim. *Tice*[ v. Centre Area Transp. Auth.], 247 F.3d [506, ]519 [(3rd Cir. 2001)]; *see Cossette v. Minn. Power & Light*, 188 F.3d 964, 971-72 (8th Cir. 1999)(remanding for consideration of whether plaintiff's claimed injury of "being

v. Phone Directories Co., 397 F.3d 1256, 1268 (10th Cir. 2005); Davidson v. Am. Online, Inc., 337 F.3d at 1188.  As with other discrimination claims, the plaintiff may show a genuine issue of material fact for such intent through direct evidence or through circumstantial evidence, pursuant to the McDonald Douglas framework.  Cf. Pushkin v. Regents of Univ. of Colo., 658 F.2d at 1387.

## FAILURE TO EXHAUST ADEA ADMINISTRATIVE REMEDIES

A court has jurisdiction over an ADEA claim only after the plaintiff exhausts the EEOC's administrative remedies.  See Hankishiyev v. ARUP Labs., 732 F. App'x 673, 677 (10th Cir. 2018)(unpublished)(citing Shikles v. Sprint/United Mgmt. Co., 426 F.3d 1304, 1306 (10th Cir. 2005)).  A plaintiff must exhaust the remedies for each theory and incident of discrimination.  See Logsdon v. Turbines, Inc., 399 F. App'x 376, 378 (10th Cir. 2010)(unpublished).  The Tenth Circuit relies on the EEOC's charge of discrimination form to determine whether a plaintiff has

---

treated in a condescending and patronizing manner" was a "tangible injury" sufficient to support a claim under § 12112(d)).  Other courts suggest that an impermissible inquiry claim brought under § 12112(d), like a disability discrimination claim brought under § 12112(a), requires evidence of an adverse employment action.  *See Armstrong,* 141 F.3d at 560.

Whindleton v. Coach, Inc., No. 3:13-CV-00055, 2015 WL 412021, at *3 (W.D. Va. Jan. 30, 2015)(Conrad, J.).  The Tenth Circuit has specifically described that discrimination in ADA cases -- other than failure-to-accommodate cases, require adverse employment actions.  See EEOC v. C.R. England, Inc., 644 F.3d at 1038.

If the Court wrote on a clean slate, it would not require a plaintiff to establish an adverse employment action.  The Court agrees that a plaintiff must demonstrate more than a technical violation to establish a § 12112(d) claim, but, because Congress left ambiguous in the statute the injury required for recovery, and because Congress prohibited per se all such questions and not discrimination through such questions, the Court would read the statute to permit recovery for a broader range of injuries.

The answer to whether a harm other than an adverse employment action satisfies the injury requirement is academic in this case.  White suffered an adverse employment action when the Town of Hurley did not hire him after the April, 2016, interview.  See Dick v. Phone Directories Co., 397 F.3d at 1268 (explaining that hiring decision constitute adverse employment actions).

exhausted the EEOC's remedies.  See Hankishiyev v. ARUP Labs., 732 F. App'x at 677 (citing

Jones v. Needham, 856 F.3d 1284, 1290 (10th Cir. 2017)).  Accordingly, generally, where a

plaintiff does not check the age-discrimination box on the charge of discrimination, the plaintiff

has not exhausted his or her administrative remedies.  See Hankishiyev v. ARUP Labs., 732

F. App'x 673 at 677.

## ANALYSIS

The Court grants summary judgment for the Town of Hurley.  First, the Court will not

permit Kleiner to testify before a jury to the opinions in the Kleiner Report, because the opinions

are not helpful to a trier of fact and because Kleiner lacks the qualifications to offer an expert

opinion whether Town of Hurley would suffer an undue hardship if it accommodated White.  For

these same reasons, in deciding the MSJ, the Court will not treat Kleiner's opinions as expert

testimony equivalent to factual evidence.  The Court views Kleiner's opinions as additional legal

argument and will treat it as briefing.  The parties may not rely on the Kleiner Report at trial,

because the Court deems it inadmissible hearsay.  The Court further concludes that it will grant

summary judgment as to: (i) Count I's failure-to-accommodate claim, because White has produced

insufficient evidence to establish a genuine dispute of material fact whether he is a qualified

individual who could perform the essential functions of a HPD officer and whether he requested a

reasonable accommodation, and because the Town of Hurley had no obligation to engage in an

interactive process after White did not request a reasonable accommodation; (ii) Count II's

retaliation claim, because White's request for unreasonable accommodation is not a protected

activity, and because White has not shown a genuine dispute of material fact whether a causal

connection exists between his request for leave and his employment's termination, or whether the

Town of Hurley rejected White's request for a legitimate, non-pretextual reason -- that it needed

HPD officers who could serve on duty; (iii) Count III's ADEA claims, which White states in his

MSJ Response that he will not pursue; and (iv) Count IV's medical-inquiry claim, because the

Town of Hurley could lawfully ask White about his injury and recovery, and because White does

not illustrate a genuine dispute of material fact whether the Town of Hurley rejected White's

employment application for legitimate, non-pretextual reasons -- concerns that he could not

interact courteously with Town of Hurley citizens.  In the analysis below, the Court does not

discuss White's ADEA claim, because White voluntarily withdraws this claim.  See Dec. 21 Tr.

at 41:2-4 (Foy).

## I.     THE COURT GRANTS THE EXPERT MOTION IN PART AND DENIES IT IN PART.

The Court will not permit Kleiner to testify to the opinions in the Kleiner Report.  Kleiner's

testimony will not help a trier of fact, and he is not qualified to opine that the Town of Hurley

would not have suffered an undue hardship if it had accommodated White.  The Court also will

not allow the parties to rely on the Kleiner Report at trial, because it is inadmissible hearsay.

### A.     THE COURT WILL NOT PERMIT KLEINER TO TESTIFY TO HIS OPINIONS BEFORE A JURY OR, IN DECIDING THIS OPINION, CONSIDER KLEINER'S OPINIONS AS MORE THAN ADDITIONAL LEGAL ARGUMENTS.

In this sub-section, the Court discusses two questions: (i) to what the Court will permit

Kleiner to testify at trial; and (ii) whether and how, in deciding the MSJ, it will weigh Kleiner's

opinions.  First, the Court will not permit Kleiner to testify before a jury to the opinions in the

Kleiner Report, because the opinions are not helpful to a trier of fact and because Kleiner lacks the

qualifications to offer an expert opinion whether Town of Hurley would suffer an undue hardship

if it accommodated White. Second, for these same reasons, in deciding the MSJ, the Court will not treat Kleiner's opinions as expert testimony equivalent to factual evidence; the Court will, rather, view Kleiner's opinions as additional legal argument and briefing. Although the Court's decision turns on two factors relevant to admitting expert testimony, for the reader's benefit, in the analysis before, the Court walks through all the requirements for expert witnesses.

First, Kleiner lacks the qualifications to opine whether the Town of Hurley would have suffered an undue hardship if it had accommodated White's request for leave. See Kleiner Report at 8, 15-17. See also Expert Proffer at 10. An expert must be "qualified . . . by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The expert must have "such skill, experience or knowledge in [a] particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). Kleiner has considerable background in human resources, see Kleiner Report at 1; Expert Proffer at 1, such that even the Town of Hurley does not dispute Kleiner's qualifications to testify in the area, see Jan. 15Tr. at 63:18-20 (Williams). As the Town of Hurley notes, Kleiner does not, however, have expertise in a field relevant to assessing the consequences that an HPD officers' request for leave has for the HPD. See Dec. 21 Tr. at 60:3-17 (Jarmie). Kleiner's background provides him a foundation to understand what generally rises to the level of an undue hardship, but not to analyze, based on counterfactuals, the particular hardships that HPD may have faced. He has no qualifications showing why he would know that, because the Grant Sheriff's Office and the NM State Police sometimes covered territory and events within the Town of Hurley's boundaries, the Town of Hurley would not have suffered an undue hardship. See Kleiner Report at 17; Expert Proffer at 9.

He has no personal experience in the Town of Hurley's governance; in the HPD; in law enforcement generally; in how the HPD, the Grant Sheriff's Office and the NM State Police work together; or even broadly in cooperation between municipal, county, and state police forces. The Court will not, therefore, permit Kleiner to testify on or itself consider this opinion, and, because this opinion forms a sub-opinion that supports Kleiner's conclusion that the Town of Hurley did not comply with the EEOC's standards, the Court also deems Kleiner unqualified to proffer that final opinion.

Second and most importantly, Kleiner's testimony will not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). An expert should not "merely tell the jury what result to reach." United States v. Barile, 286 F.3d at 759-60. An expert may not opine to information that "the untrained layman would be qualified to determine intelligently and to the best possible degree . . . without enlightenment from those having a specialized understanding of the subject involved in the dispute." United States v. Fredette, 315 F.3d 1235, 1239 (10th Cir. 2003)(quoting Corneveaux v. CUNA Mut. Ins. Grp., 76 F.3d 1498, 1504 (10th Cir. 1996)). Experts also should not provide testimony that "articulates and applies the relevant law," as such statements "circumvent[] the jury's decision-making function by telling it how to decide the case." Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150, 1204 (D.N.M. 2016)(Browning, J.)(internal quotation marks omitted)(quoting Specht v. Jensen, 853 F.2d 805, 808 (10th Cir. 1993)). The Court has recognized an exception to this general rule when experts speak to discrete, statutory definitions. See SEC v. Goldstone, No. CIV 12-0257 JB/LFG, 2016 WL 3135651, at *44 (D.N.M. May 10, 2016)(Browning, J.). Courts often can identify such impermissible legal conclusions by "determin[ing] whether the terms used by the witness have a

separate, distinct and specialized meaning in the law different from that present in the vernacular." Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d at 1204 (quoting Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d at 1212).

In several opinions, Kleiner recapitulates facts that a layman could "determine intelligently" without aid. United States v. Fredette, 315 F.3d at 1239 (quoting Corneveaux v. CUNA Mut. Ins. Group, 76 F.3d at 1504). He lists that the Town of Hurley did not modify its leave policy, that it did not investigate whether it had a vacant position, and that it did not investigate whether accommodating White would pose an undue hardship. See Kleiner Report at 15-17; Expert Proffer at 2-7, 9. Through such assertions, Kleiner does little more than summarize and stress facts that Kleiner gleaned from the Ordonez Depo. and the Rodriguez Depo.; at most, Kleiner makes the most basic inferences from the Ordonez' and Rodriguez' testimony. The trier of fact does not need an expert to remind them of the case's facts as Kleiner proposes to do. See SEC v. ITT Educ. Servs., Inc., 311 F. Supp. 3d 977, 987-88 (S.D. Ind. 2018)(Magnus-Stinson, J.)("[I]t is inappropriate 'for experts to become a vehicle for factual narrative.'" (quoting SEC v. Tourre, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013)(Forrest, J.))). Wood v. Montana Dep't of Revenue, No. CV 10-13-H-DWM, 2011 WL 4348301, at *2-3 (D. Mont. Sept. 16, 2011)(Molloy, J.)(precluding an expert from testifying when and how regularly a supervisor began communicating with an employee about his "excessive absences and his work performance issues," and whether the employee requested FMLA leave and understood the process for such requests).

Through his opinion that the Town of Hurley did not face an undue hardship, Kleiner proposes to proffer a legal conclusion, which likewise the Court deems inadmissible and not

helpful to the trier of fact.  See Kleiner Report at 17.  Kleiner frames this conclusion in a term with

a special, legal meaning -- "undue hardship."  See Burkhart v. Wash. Metro. Area Transit Auth.,

112 F.3d at 1212.  Although White contends that Kleiner does not present a legal conclusion,

because he applies the EEOC's non-binding guidance, see Jan 15 Tr. at 69:8-70:25 (Foy), the

EEOC promulgates the guidance as an interpretation of the ADA, and the "undue hardships"

issue's relevance comes because it is as an affirmative defense to failure-to-accommodate claims.

See Punt v. Kelly Servs., 862 F.3d at 1050 (listing undue hardship as an affirmative defense to the

ADA).  Kleiner, accordingly, opines on whether the Town of Hurley has an affirmative defense to

White's ADA claim, so strays into an inadmissible legal conclusion.  See, e.g., Peters v. Baltimore

City Bd. of Sch. Comm'rs, No. CIV. WMN-13-3114, 2014 WL 4187307, at *6-8 (D. Md. Aug.

21, 2014)(Nickerson, J.)(prohibiting testimony that "expressly tells the jury what result to

reach . . . as a result of her purported expertise in applying the aforementioned statutes"); Sitter v.

Ascent Healthcare Sols., Inc., No. C-09-5682 EMC, 2011 WL 2682976, at *1 (N.D. Cal. July 8,

2011)(Chen, J.)(stating that an expert may "not expressly opine on ultimate legal question, e.g.,

whether Defendant's failure to act constituted discrimination, retaliation, or a failure to prevent

such"); EEOC v. Sierra Pac. Indus., No. 208CV01470, 2010 WL 3941416, at *1 (E.D. Cal. Oct.

5, 2010)(England, J.)("Plaintiff correctly points out that Finkle cannot offer direct testimony with

regard to . . . : whether or not Elshenawy suffered disparate treatment, whether or not retaliation

against Elshenawy for engaging in protected activities took place, and whether or not a hostile

work environment may have existed."); Doane v. Burlington Res. Oil & Gas Co., No. 06-CV-040-

D, 2007 WL 4616287, at *1 (D. Wyo. Jan. 10, 2007)(Downes, J.)("Dr. Varca is prohibited from

testifying as to whether Plaintiff was disabled under the Americans With Disabilities Act (ADA),

whether Plaintiff's major life activity was substantially limited, and whether Plaintiff's termination constituted a violation of the ADA.")

Kleiner also cannot testify and the Court will not consider Kleiner's testimony that the Town of Hurley did not adhere to the EEOC's guidance. The Court has already stated that it will preclude Kleiner from testifying to this final opinions' sub-parts and will not permit White to introduce without support this final opinion. Moreover, although, in reaching this conclusion, Kleiner does not use words with specifically legal meanings, he opines whether the parties have satisfied standards for acting under the ADA. The Court precludes such testimony on broad standards of care. See SEC v. Goldstone, No. CIV 12-0257 JB/LFG, 2016 WL 3135651, at *41-44 (prohibiting testimony on "reasonableness"). That Kleiner discusses the EEOC's interpretation of the ADA makes his opinions even less helpful to a trier of fact, because it potentially misleads the listener with non-binding standards to which the government's sanction lends authority.

Third, the Court concludes by a preponderance of the evidence that Kleiner considered sufficient facts or data. See Fed. R. Civ. P. 704(c). The Town of Hurley contends that Kleiner did not use sufficient facts and data, see Fed. R. Civ. P. 704(c), because Kleiner did not review the whole record or all discovery documents, see Jan. 15 Tr. at 63:22-64:9 (Williams). Kleiner reviewed several documents from the record, including the Complaint and the attached exhibits, the Ordonez Depo., the Huerta Depo., the Stevens Depo., the Rodriguez Depo., and the White Depo. See Kleiner Report at 1. Aside from the letters between White and the Town of Hurley, the parties rely on little other evidence to support their arguments for and against the MSJ, and have given no indication that they will introduce additional, novel evidence at trial. Kleiner's opinions do not focus on the letters' contents but on the Town of Hurley's actions after it received

the Aug. 3 Letter.  The Town of Hurley does not indicate specific information that Kleiner ignored, and the Court cannot say by a preponderance of the evidence that Kleiner did not review enough information around which the dispute revolves.  That Kleiner weighs the evidence goes to his helpfulness to the trier of fact and not to this factor.

Fourth, the Town of Hurley's arguments that Kleiner did not use a reliable methodology do not convince the Court, which concludes that a preponderance of the evidence indicates the contrary.  Kleiner identified the relevant standard and the key facts, and applied the standard to the facts.  <u>See</u> Expert Proffer at 7; Jan. 15 Tr. at 68:1-25 (Foy); <u>id.</u> at 22:15-23:25 (Kleiner).  The Court sees nothing inherently wrong with this process.  Lawyers, the Court, and jurors daily use the same process to perform their work.  Moreover, the human resources field recognizes content-analysis as a reliable tool.  <u>See</u> Jan. 15 Tr. at 24:6-23 (Foy, Kleiner).  The methodology does not pose reliability problems -- the conclusions from the methodology implicate concerns for rule 702(a)'s mandate that the opinion help the trier of fact.  Kleiner adds nothing to the analysis that any juror could undertake, but that fact does not mean that his methodology is unreliable.  <u>Cf.</u> <u>Blakeslee v. Shaw Infrastructure, Inc.</u>, No. 3:09-CV-00214 JWS, 2011 WL 6001836, at *1-3 (D. Alaska Dec. 1, 2011)(Sedwick, J.)("Shaw argues that Kleiner is simply applying the facts of Blakeslee's termination against the standards in a human resources textbook. . . . The simplicity of a methodology does not render it unreliable.").

Fifth, the Court deems by a preponderance of the evidence Kleiner's application of the methodology reliable.  Kleiner identifies facts that he deems relevant and records his conclusions reflecting those facts.  That, in the Kleiner Report, Kleiner does not "show his work" for every conclusion does not worry the Court.  <u>See</u> Jan. 15 Tr. at 65:13-17 (Williams).  A reader can track

how Kleiner moved from the EEOC guidance to the facts to the conclusions, <u>see</u> Kleiner Report at 8-17, and the Expert Proffer reflects further that Kleiner received his conclusions through connections between the EEOC guidance and the facts, <u>see</u> Expert Proffer at 7-8. Kleiner weights some facts more heavily than others, but any person applying a similar methodology would do the same -- imagine a lawyer or jury assessing the facts. Again, this weighting casts shadow on the opinions' usefulness and not the manner that Kleiner applied the methodology.

Accordingly, should Kleiner testify at trial, the Court will preclude him from testifying to the opinions in his Kleiner Report, his Expert Proffer, and expressed at the January 15, 2019, hearing. The Court likewise will not rely on these opinions as expert testimony for this Memorandum Opinion and Order's purposes. The Court weighs Kleiner's opinion as legal arguments on the same level as the Town of Hurley's and White's briefs.[65]

## B.    THE KLEINER REPORT IS INADMISSIBLE HEARSAY.

The Court precludes introduction of the Kleiner Report at trial and will not consider the Kleiner Report to state facts relevant to the MSJ, because the Kleiner Report is inadmissible hearsay. The Court sees no evidence that Kleiner swore to the Kleiner Report or that it is in effect an affidavit. Kleiner wrote the report outside of court, and, to consider the facts that the Kleiner Report recites at trial or in this Memorandum Opinion and Order, would introduce those facts for

---

[65]Should Kleiner testify at trial, the Court will impose some further instructions on him. The Court will preclude Kleiner from reciting the EEOC's guidance in a manner that invades the Court's duty to tell the jury the law. The Court will, however, permit Kleiner to generally explain elements of the EEOC's guidance. Kleiner could, for instance, describe what an interactive process might entail or what might constitute an undue hardship. <u>See</u> <u>Hollen v. Chu</u>, No. CV-11-5045-EFS, 2013 WL 5306594, at *5 (E.D. Wash. Sept. 19, 2013)(Shea, J.)(permitting an expert to explain "1) what the 'interactive process' is, 2) what a 'reasonable accommodation' looks like, and 3) how employers typically engage in the process of accommodating disabled employees.").

the truths that Kleiner repeats from other sources. The Court has consistently reached this conclusion when faced with expert reports. See e.g., Walker v. Spina, No. CV 17-0991 JB\SCY, 2019 WL 188544, at *18 (D.N.M. Jan. 11, 2019)(Browning, J.)(precluding an expert report, because it constituted inadmissible hearsay); Skyline Potato Co. v. Hi-Land Potato Co., No. CIV 10-0698 JB/RHS, 2013 WL 311846, at *15 (D.N.M. Jan. 18, 2013)(Browning, J.)(excluding an expert report because it "is a written document that [the expert] prepared outside of the court and contains statements offered "for the truth of what the statements assert"); Vondrak v. City of Las Cruces, No. CIV 05-0172 JB/LFG, 2007 WL 2219449, at *3 n.4 (D.N.M. May 14, 2007)(Browning, J.)(excluding the expert report "because rule 703 of the Federal Rules of Evidence allows an expert to rely on inadmissible facts in reaching an opinion or inference, but does not allow the proponent of the expert testimony to use the expert as a conduit for a party to get in otherwise inadmissible evidence"), aff'd in part, rev'd in part, dismissed in part, 535 F.3d 1198 (10th Cir. 2008); United States v. Mirabal, No. CR 09-3207 JB, 2010 WL 3834072, at *4 (D.N.M. Aug. 7, 2010)(Browning, J.)(concluding that expert report was inadmissible, and noting that, although inadmissible, "[the expert] could rely upon that report, because the materials that form the basis of an expert opinion need not, themselves, be admissible").

## II.     **THE COURT WILL GRANT THE MSJ.**

The Court will grant summary judgment in the Town of Hurley's favor. White has not established a genuine issue of material fact to survive summary judgment on any of his claims. The Court takes each claim in turn.

**A.    WHITE DOES NOT ESTABLISH A PRIMA FACIE CASE FOR HIS FAILURE-TO-ACCOMMODATE CLAIM, BECAUSE HE IS NOT A QUALIFEID INDIVIDUAL AND DID NOT REQUEST A REASONABLE ACCOMMODATION.**

The Court first grants the Town of Hurley summary judgment on White's Count I -- his failure-to-accommodate claim.  To establish a prima facie case, White must show that he is (i) disabled; (ii) otherwise qualified; and (iii) requested a "plausible reasonable accommodation." Punt v. Kelly Servs., 862 F.3d at 1050 (quoting Sanchez v. Vilsack, 695 F.3d at 1177).  The Town of Hurley does not dispute that White is disabled, but White has not shown that a genuine issue of material facts exists whether he is otherwise qualified or whether he requested a reasonable accommodation.  Because White has not established these elements, the Town of Hurley had no duty to engage in an interactive process with White.

First, White does not set forth facts to show a genuine issue of material fact that he was a qualified individual.  An individual is qualified only if they, with or without a reasonable accommodation, can "perform all of a position's essential functions, even if they are rarely called upon to perform them in practice."  Osborne v. Baxter Healthcare Corp., 798 F.3d at 1271-72 (citing Hennagir v. Utah Dep't of Corr., 587 F.3d at 1262-64; Martin v. Kansas, 190 F.3d 1120, 1120 (10th Cir. 1999); Anderson v. Coors Brewing Co., 181 F.3d at 1176-78).  See 42 U.S.C. § 1211(8) (defining qualified individual as "[a]n individual who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires").  The Tenth Circuit has noted that an individual who cannot work for over six months is not a qualified individual who can perform essential functions, even with a reasonable accommodation.  See Hwang v. Kansas State Univ., 753 F.3d at 1161-62.  By August, 2017, White had not attended work for over a year and did not know when or if he might return to

work.  See MSJ ¶ 9, at 2 (citing Oct. 22 Letter; Town of Hurley Minutes ¶ 14, at 2; White Depo. at 34:2-7); MSJ Response ¶ 30, at 6; MSJ ¶ 10, at 2 (citing White Depo. at 36:4-15; id. at 37:1-13; id. at 68:25-69:10; id. at 70:13-24); MSJ ¶ 11, at 3 (citing Aug. 3 Letter at 1).  Moreover, HPD's job descriptions provide that the HPD officer position involves activities that White, who could not attend work in any form, could not perform, such as: (i) being "responsible for the accomplishment of the police mission on his beat"; and (ii) "continuously patrol[ling] every part of his patrol area giving particular attention to and frequently rechecking locations where the crime hazard is great."  MSJ ¶ 19, at 4.  See, e.g., Mason v. Avaya Commc'ns, Inc., 357 F.3d at 1119 (directing courts to consider the employer's description of a job's essential functions).  Cf. Martin v. Kansas, 190 F.3d at 1131-32 (concluding that a correctional officer's essential duties included subduing inmates, responding to emergencies, and standing for long periods and that performing light duty does not fulfill a qualified individual's obligations).

White does not dispute these facts and instead wants the Court to apply the standard for a qualified individual under the ADA's Title II[66] rather than under § 1211(8)'s standard.  See MSJ Response at 12-13.  The Court denies White's request.  The Tenth Circuit has held that Title II is not "the proper tool for pursuing employment discrimination claims."  Elwell v. Okla. ex rel. Bd. of Regents of Univ. of Okla., 693 F.3d 1303, 1314 (10th Cir. 2012).  But see Bledsoe v. Palm Beach Cty. Soil & Water Conservation Dist., 133 F.3d 816, 822 (11th Cir. 1998)(concluding that

---

[66]For Title II, a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

Title II covers employment discrimination claims).[67]  Title I, whence the Town of Hurley draws

its definition for qualified individual, provides the appropriate vehicle for White's claim.  See

Elwell v. Oklahoma ex rel. Bd. of Regents of Univ. of Okla., 693 F.3d at 1314 ("Title I is the

exclusive province of employment discrimination within the ADA.").

If White could show that a reasonable accommodation would have enabled him to perform

essential functions despite his disability, White could overcome the Town of Hurley's argument

on the qualified-individual element.  No genuine issue of material facts exists, however, whether

White requested a reasonable accommodation from the Town of Hurley.  The Town of Hurley has

produced evidence that White did not request a reasonable accommodation.  Although a request

for leave may be a reasonable accommodation, the Tenth Circuit has recognized two limitations

on such requests: (i) "[t]he employee must provide the employer an estimated date when she can

resume her essential duties," Robert v. Bd. of Cty. Comm'rs of Brown Cty., 691 F.3d 1211, 1218

(10th Cir. 2012)(citing Cisneros v. Wilson, 226 F.3d at 1130; Rascon v. US W. Commc'ns, Inc.,

143 F.3d at 1333-35); and (ii) "[a] leave request must assure an employer that an employee can

perform the essential functions of her position in the 'near future,'" Robert v. Bd. of Cty. Comm'rs

of Brown Cty., 691 F.3d at 1218 (quoting Cisneros v. Wilson, 226 F.3d at 1129)).  A request for

leave for six months violates the second limitation.  See Hwang v. Kansas State Univ., 753 F.3d

at 1161-62.  According to the Tenth Circuit, "[a]fter all, reasonable accommodations -- typically

things like adding ramps or allowing more flexible working hours -- are all about enabling

---

[67]The Court agrees with the Tenth Circuit that it adopts the better rule for essentially the
reasons the Tenth Circuit articulates in Elwell v. Oklahoma ex rel. Board of Regents of University
of Oklahoma.  The ADA's Title I provides relief for employment discrimination and reading Title
II to do the same makes Title I superfluous.  See Elwell v. Okla. ex rel. Bd. of Regents of Univ. of
Oklahoma, 693 F.3d at 1311-14.

employees to work, not to not work." Hwang v. Kan. State Univ., 753 F.3d at 1161-62. White wrote to the Town of Hurley requesting leave for six months, or seven months, or nine months, or longer. See MSJ ¶ 11, at 3 (citing Aug. 3 Letter at 1 (requesting leave for "*at least* the next six months" (emphasis in MSJ)). He told the Town of Hurley that he would "not be in a position to be evaluated for return as a police officer for at least another six months and possibly nine months," and would "be unable to adequately function as a Hurley Police Officer for at least an additional six to nine months, *if ever*." MSJ ¶ 12, at 3 (emphasis in MSJ)(citing Aug. 3 Letter at 1). The Aug. 3 Letter does not convey White's prognosis or that White would certainly return to work. See Rascon v. US W. Commc'ns, Inc., 143 F.3d at 1333-35 (holding that a request for leave when the plaintiff stated that the estimate time required was four months, the employer knew his course of treatment, and the plaintiff had a good prognosis was reasonable); Myers v. Hose, 50 F.3d at 283 ("We therefore hold that reasonable accommodation does not require the County to wait indefinitely for Myers' medical conditions to be corrected, especially in light of the uncertainty of cure.").

White does not produce sufficient evidence to demonstrate a genuine issue of material fact and his arguments to the contrary do not convince the Court. White's contentions about his specificity regarding the reasons for his request and the time in retrospect that his healing required cannot transform his request into one for definite leave. See MSJ Response at 14-15. The inquiry focuses on duration -- notice to the employer of an estimated duration and the expectation that the duration will not be long. See Robert v. Bd. of Cty. Comm'rs of Brown Cty., 691 F.3d at 1218. The Town of Hurley received no measure from White of when or if White might work again at HPD.

The Court deems White's other arguments largely irrelevant to its analysis. White argues that Ordonez did not use the word "reasonable accommodation" when he denied White's request, see MSJ Response at 14, but an employer does not need to use specific, legal language. An employer has no reason to think that, in writing a letter to a lay employee, it should use legal jargon, and the desire for goodwill between an employer and an employee counsels that the employer should do the opposite, and use language that carries no esoteric, particular meaning. White's contention that he requested a reasonable accommodation, because he acted within the Town of Hurley's leave policy, see MSJ Response at 15, runs into the Tenth Circuit's previous rejection of that argument, see Cisneros v. Wilson, 226 F.3d at 1131. The Tenth Circuit emphasized that the analysis focuses on reasonableness and on the impairment's expected duration. See Cisneros v. Wilson, 226 F.3d at 1131. For the Court, White's argument that the Town of Hurley previously granted White leave, see MSJ Response at 14, points in the direction opposite that to which White would have it indicate. That White desires more leave time -- for a length that he cannot specify -- increases the uncertainty whether he would recover to return to HPD in the near or far future. See Valdez v. McGill, 462 F. App'x at 817-18 (finding no reasonable accommodation where the plaintiff could not return to work on the day requested in the first note, was uncertain if he could return to work within the time requested in the second note, and did not explain whether his health problems would be resolved). White's six to nine months additional leave would add to over a year and a half of leave. This time triples the six months that the Tenth Circuit has held unreasonable. See Hwang v. Kan. State Univ., 753 F.3d at 1161-62. White has not shown a genuine dispute of material fact whether he requested a reasonable accommodation, so he cannot establish either the prima facie case's second element -- that even

with a reasonable accommodation he could perform an HPD officers' duties -- or third element --

that he requested a reasonable accommodation.

Without White being a qualified individual and requesting a reasonable accommodation,

the Town of Hurley had no obligation to engage in an interactive process. See Valdez v. McGill,

462 F. App'x at 819; Mason v. Avaya Commc'ns, Inc., 357 F.3d at 1118-24 & 1124 n.4

(concluding that, where a service coordinator suffering from post-traumatic stress disorder and

unable to physically attend work was not a qualified individual, and where her request to work

from home was not a request for a reasonable accommodation, the employer had no duty to engage

in an interactive process). The Town of Hurley moreover did not need to consider the

accommodations that White, through Kleiner, contends it should have investigated -- extending

the Town of Hurley's leave policy and reassigning White. See Kleiner Report at 16-17. Requiring

the Town of Hurley to investigate changing a leave policy for an unreasonable leave request is

nonsensical. The Town of Hurley never had a duty to provide White the leave he requested. It

should not have to investigate changing its policy for something it did not have to provide. If

White desired reassignment to a vacant position, he should have expressed this interest to the Town

of Hurley. "[T]he interactive process must ordinarily begin with the employee providing notice to

the employer of the employee's disability and any resulting limitations, and expressing a desire

for reassignment if no reasonable accommodation is possible in the employee's existing job."

Smith v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d at 1171-72 (footnote and citation

omitted)(citing Taylor v. Principal Fin. Grp., Inc., 93 F.3d at 165). See Valdez v. McGill, 462

F. App'x at 817 ("And, to the extent Valdez argues Mueller could have reasonably accommodated

Brown through temporary reassignment, the district court correctly concluded he failed to

specifically identify an appropriate available job vacancy as our precedent requires."). The Town

of Hurley had no duty to propose reassignment on its own.[68]

### B. FOR HIS RETALIATION CLAIM, WHITE CANNOT DEMONSTRATE A GENUINE ISSUE OF MATERIAL FACT WHETHER HE ENGAGED IN PROTECTED ACTIVITY AND THE TOWN OF HURLEY TERMINATED HIS EMPLOYMENT BECAUSE OF THE AUG. 3 LETTER.

White also has not established a genuine issue of material fact as to his retaliation claim.

To establish such a case, White must show that genuine disputes of material fact exist as to

whether: "(1) . . . he engaged in protected opposition to discrimination, (2) . . . a reasonable

employee would have found the challenged action materially adverse, and (3) . . . a causal

connection existed between the protected activity and the materially adverse action." Argo v. Blue

Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202 (footnote omitted). If White establishes a

prima facie case, the burden shifts to the Town of Hurley "to articulate a legitimate,

nondiscriminatory reason for" its actions and, if it does so, "the burden shifts back to" the Town

of Hurley "to demonstrate that the proffered explanation is a pretext for retaliation." Argo v. Blue

Cross & Blue Shield of Kansas, Inc., 452 F.3d at 1202-03. The Town of Hurley does not dispute

that White suffered an adverse employment action. White, however, has not produced sufficient

evidence to dispute that he did not engage in a protected activity, or that no causal connection

exists between his request and the Town of Hurley's refusal to grant it. Further, the Town of

Hurley has a legitimate, non-pretextual reason for not granting White's request for leave.

---

[68]The Court agrees with White that the Town of Hurley's arguments about the FMLA miss his point. See MSJ Response at 16. White explains that he mentioned the FMLA in the Sep. 11 Letter and Aug. 3 Letter, because he did not know whether the FMLA governed the Town of Hurley. See Dec. 21 Tr. at 36:20-37:5 (Foy). White's failure-to-accommodate claim does not involve the FMLA. This mention, for White and for the Court's reading of White's Complaint, is unrelated to the ADA claim.

White has not shown a genuine dispute of material fact that he did not engage in protected activity when he sent the Aug. 3 Letter. "[A] request for accommodation can constitute protected activity supporting a retaliation claim." Foster v. Mountain Coal Co., 830 F.3d 1178, 1188 (10th Cir. 2016). To sustain a retaliation claim, a plaintiff does not need to be a qualified individual under the ADA; a plaintiff's "reasonable, good faith belief that the statute has been violated suffices." Selenke v. Med. Imaging of Colo., 248 F.3d at 1264. The request for accommodation must be adequate and the requested accommodation must be reasonable. See Foster v. Mountain Coal Co., 830 F.3d at 1187 (noting that a plaintiff "must show an adequate request for an accommodation sufficient to qualify as protected activity"); Jones v. U.P.S., Inc., 502 F.3d 1176, 1194 (10th Cir. 2007)("We have treated requests for reasonable accommodation as protected activity under the ADA. . . . And a request for reassignment to a vacant position is a request for a reasonable accommodation."); Selenke v. Med. Imaging of Colo., 248 F.3d at 1265 (noting that a plaintiff had a "reasonable, good faith belief that she was disabled under the ADA" and that "modification of the work environment constitutes one kind of reasonable accommodation authorized by the ADA").[69] The Town of Hurley does not dispute that White made it aware of his

---

[69]The caselaw points in conflicting directions on the question whether a requested accommodation must be reasonable for the request to rise to a protected activity. As indicated in the text, the Tenth Circuit has explicitly noted whether requested accommodations are reasonable and has used the words "requests for reasonable accommodation." Jones v. U.P.S., Inc., 502 F.3d at 1194. In failure-to-accommodate cases, the phrase "request for reasonable accommodation" refers to the element under which courts consider whether the requested accommodation is reasonable. See, e.g., Punt v. Kelly Servs., 862 F.3d at 1050 (discussing an accommodation's reasonableness under "the third element of Plaintiff's prima facie case -- 'whether she requested a plausibly reasonable accommodation,'" and concluding "this request was not plausibly reasonable on its face" (quoting Sanchez v. Vilsack, 695 F.3d at 1177)). The Court deems this language controlling.

desire for accommodation, and the Court determined in the previous sub-section that White did not request a reasonable accommodation. Accordingly, he has not engaged in protected activity.

White also cannot show a genuine dispute of material fact as to a causal connection between his request for an accommodation and his employment's termination. The Tenth Circuit "previously has recognized that 'protected conduct closely followed by adverse action may justify an inference of retaliatory motive.'" Butler v. City of Prairie Vill., 172 F.3d 736, 752 (10th Cir. 1999)(quoting Marx v. Shnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996)). Temporal proximity, however, "may be insufficient, standing alone, to raise an inference of retaliatory motive." Butler v. City of Prairie Vill.,, 172 F.3d at 752. Here, Ordonez' denial of White's request and termination of White's employment is, as White describes, "a direct adverse response to Plaintiff's request." MSJ Response at 19. Evidence suggests, however, that Ordonez did not terminate White's employment because White requested an accommodation, but terminated White

---

The terms of the Tenth Circuit's statements about retaliation claims, however, could direct district courts in another direction. The Tenth Circuit has commented regarding retaliation claims that a plaintiff need only "a reasonable, good faith belief that the statute has been violated." Selenke v. Med. Imaging of Colo., 248 F.3d at 1264. The Tenth Circuit cites, for instance, Krouse v. American Sterilizer Co., 126 F.3d 494, 502 (3d Cir. 1997), in which the United States Court of Appeals for the Third Circuit held: "Unlike a plaintiff in an ADA *discrimination* case, a plaintiff in an ADA *retaliation* case need not establish that he is a 'qualified individual with a disability.' By its own terms, the ADA retaliation provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA." Krouse v. Am. Sterilizer Co., 126 F.3d at 502 (cited in Selenke v. Med. Imaging of Colo., 248 F.3d at 1264). See Jones v. U.P.S., Inc., 502 F.3d at 1194 ("Jones must therefore show that he reasonably believed he was entitled to an accommodation under the ADA."). The reasonable-accommodation inquiry is an element in determining whether an employer violated the ADA and, because the ADA defines a qualified individual as an individual who can perform essential functions with or without a reasonable accommodation, the reasonable-accommodation inquiry is an intrinsic part of the qualified-individual inquiry. Applying the Tenth Circuit's statements, a plaintiff should need only a reasonable belief that he or she requested a reasonable accommodation.

because White could not work.  See MSJ ¶ 13, at 3 (citing White Depo. at 40:4-11; Ordonez Depo. at 13:2-7); id. ¶ 14, at 3 citing White Depo. at 40:13-17; id. at 66:23-67:16; id. at 69:14-17).  White has produced no evidence to the contrary.

Moreover, the Town of Hurley articulates legitimate, nondiscriminatory reasons for terminating White, and White has not shown these reasons to be pretextual.  The Town of Hurley had already extended itself for White; it was short two officers during White's absence, and it needed officers who could cover its jurisdiction.  See MSJ at 20; MSJ ¶ 13, at 3 (citing White Depo. at 40:4-11; Ordonez Depo. at 13:2-7); id. ¶ 14, at 3 (citing White Depo. at 40:13-17; id. at 66:23-67:16; id. at 69:14-17).  White offers in response to the Town of Hurley's argument that it "had a high rate of turnover during this period," that "the Town's police calls are covered by the State Police and the Grant County Sheriff when Town officers are unable to cover," and that the Town of Hurley did not follow its personnel policy.  MSJ Response at 19.  The high rate of turnover helps the Town of Hurley more than it helps White.  If the Town of Hurley had more HPD officers who could perform their shifts, it would less likely lack coverage whenever turnover occurred.  White presents no evidence how the Town of Hurley worked with the Grant Sheriff's Office and the NM State Police, so the Court cannot determine what relationship the entities had -- for instance, whether the Grant Sheriff's Office and the NM State Police always helped when the HPD desired help, whether they covered specific crimes or certain areas, or whether they worked amiably with the Town of Hurley and HPD.  Moreover, even a fully funded police department may leave calls unattended or crimes under-investigated.  The Town of Hurley was entitled to have and want the HPD to cover its jurisdiction for both sovereignty reasons and to achieve the best coverage possible.  Last, that the Town of Hurley did not follow its personnel policy does not alone

undermine the Town of Hurley's articulated reasons for its actions. The personnel policy is permissive; it does not require that the Town Council approve a request for leave. See MSJ ¶ 8, at 2 (citing Hurley Policy 7.3, at 2). The Town of Hurley had a legitimate reason to deny additional leave to an employee who had not worked for a year and might not work for another six months, or nine months, or ever. See MSJ Response ¶ 33, at 7 (citing Hurley Policy 7.3(a), at 2).

### C. WHITE CANNOT SUSTAIN A CLAIM AGAINST THE TOWN OF HURLEY BASED ON THE QUESTIONS THAT AN INTERVIEWER ASKED ABOUT HIS INJURIES AND RECOVERY.

White cannot show a genuine issue of material fact for a disparate treatment claim arising from the interviewer's questions at the April, 2016, interview. To establish a prima facie case, White needs to show that: (i) the Town of Hurley violated § 12112(d)(2); and (ii) the Town of Hurley discriminated against him because of the § 12212(d)(2) violation. If White establishes a prima facie case, the burden shifts to the Town of Hurley "to articulate a legitimate, nondiscriminatory reason for" not hiring him and, if it does so, "the burden shifts back to" the Town of Hurley "to demonstrate that the proffered explanation is a pretext." Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202-03. The Town of Hurley does not dispute that its failure to hire White constitutes an adverse employment action. A genuine issue of material fact exists whether an interviewer asked White about his injury and recovery. The Court must construe all facts in favor of the nonmovant, so the Court must assume, for purposes of the Motion, that the question was asked. The Court, however, agrees with the Town of Hurley that it did not violate § 12112(d)(2) and, although White can establish a prima facie showing of causation, White cannot establish a question whether the Town of Hurley's articulated, legitimate reason for not hiring White is pretextual.

Preliminarily, the Court concludes that a disputed fact exists as to whether an interviewer asked White about his injury and recovery at White's interview. The Town of Hurley admits in its proposed undisputed facts and later in its MSJ that White stated that an interviewer questioned him about such issues. See MSJ ¶ 24, at 5 (citing White Depo. at 44:10-20); id. at 24. The Town of Hurley does not, however, admit that the interviewer asked White such a question. It words its argument as "even *if* one of the Selection Committee members asked plaintiff about his recovery." MSJ at 24 (emphasis in MSJ). White does not admit that an interviewer did not ask him such questions and admits no dispute exists that Rodriguez does not remember an interviewer asking White such questions. See MSJ Response ¶ 45, at 10 (citing Rodriguez Depo. at 13:1-14); MSJ Reply at 2.

The Court, then, must conclude whether the interviewer could permissibly ask these questions as a matter of law. Preliminarily, the Town of Hurley hints that such questions do not implicate § 12112(d)(2), because the interviewer did not ask them during the formal interview process. See MSJ at 24. White admits that the question occurred before the formal interview, but disputes that the timing matters. See MSJ ¶ 24, at 5 (citing White Depo. at 44:10-20); id. at 21-22. The Court agrees with White. Anyone who has attended an interview or participated in an interview would testify that, throughout the interaction, an employer debates whether to offer employment. Moreover, if, as the Tenth Circuit has noted, Congress intended to limit all questioning that would identify people with disabilities and discourage such questions' stigmatizing effect, see Griffin v. Steeltek, Inc., 160 F.3d at 594, drawing a line between a formal sitting down and asking of pre-recorded questions, and the walking into a room and informal chit-chat makes little sense. Such questions plant the idea that an interviewee has a disability and

insults the interviewee no matter when an employer asks the questions.

The Town of Hurley, however, did not violate the § 1221(d)(2). An employer may inquire "into the ability of an applicant to perform job-related functions," 42 U.S.C § 12112(d)(2)(B), and an employer need not "wear blinders to a known disability at the pre-offer stage," Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 675 (1st Cir. 1995)(permitting an employer to inquire into whether an employee with a known medical problem could "function effectively in the workplace"). See Harris v. Harris & Hart, Inc., 206 F.3d 838, 844(9th Cir. 2000)("Given that plaintiff had previously requested accommodation of his disability for the same position, defendant was not prohibited from requesting documentation from an appropriate medical professional concerning plaintiff's condition."). Cf. Laurent v. G & G Bus Serv., Inc., No. 10 CIV. 4055 JGK LMS, 2013 WL 5354733, at *5 (S.D.N.Y. Sept. 25, 2013)(Koeltl, J.)("Prescription medication usage relates directly to numerous medical conditions that affect a bus driver's job qualification, and the plaintiff points to no medications that he was required to disclose but that was unrelated to the ability to be a bus driver." (footnote omitted)). Here, the Town of Hurley could inquire whether White, who sought a safety-sensitive position, see MSJ ¶ 14, at 3 (citing White Depo. at 40:13-17; id. at 66:23-67:16; id. at 69:14-17), could perform the job, including working with the community, and could ask and work with White on reasonable accommodations. White argues that the interviewer asked the questions "to assess whether [the committee] could trust hiring a person with traumatic brain injury who may require a future reasonable accommodation." MSJ Response at 21-22. The Town of Hurley could inquire whether they could trust him to perform his job's duties and whether he would need accommodations to perform his job.

Moreover, no genuine issue of material fact exists whether the Town of Hurley

discriminated against White based on the answers. Assuming the interviewer asked the questions, White can show a prima facie case of causation. The interviewer asked the questions and, soon thereafter, following the interview, the Town of Hurley denied his employment application. See MSJ ¶ 24, at 5 (citing White Depo. at 44:10-20); id. ¶ 27, at 6 (citing April 28 Letter; Stevens Depo. at 12:21-13:9). The Town of Hurley has, however, presented a legitimate, nondiscriminatory reason for refusing to employ White. The Town of Hurley describes that the interviewers' perceived White as a hot head, with temper issues, who would not be able to work courteously with Town of Hurley citizens as the position requires. See MSJ at 27; id. ¶ 5, at 1-2 (citing White Depo. at 63:12-64:16); id. ¶ 25, at 5 (citing Huerta Depo. at 9:8-17; Rodriguez Depo. at 6:9-16; id. at 11:9-16; Stevens Depo. at 6:9-7:24; id. at 9:13-16); id. ¶ 25, at 5 (citing Interview Scoring at 1-2; Huerta Depo. at 12:25-13:14); id. ¶ 26, at 6 (citing Stevens Depo. at 12:21-13:9; id. at 18:11-19:9). The Town of Hurley contends that, for these reasons, and not White's disability, it did not hire White. See MSJ at 27; id. ¶ 26, at 6 (citing Stevens Depo. at 12:21-13:9; id. at 18:11-19:9); id. ¶ 27, at 6 (citing April 28 Letter; Stevens Depo. at 12:21-13:9). White offers no evidence other than that two interviewers gave him high scores to contest the interviewers' perceptions or decision, and the Town of Hurley's articulated reason. See MSJ Response ¶ 44, at 10 (citing Interview Scoring); MSJ Reply at 2. One interviewer, however, gave White "low-to-mid range scores for his interview," and Huerta "wrote that plaintiff was a 'hothead' even while giving plaintiff higher interview scores." MSJ ¶ 25, at 5 (quoting Interview Scoring at 1, and citing Interview Scoring at 1-2; Huerta Depo. at 12:25-13:14). The two high-scores sheets do not demonstrate a genuine issue of material fact about the interviewers' conclusions. Even with these scoresheets, the interviewers could have concluded that the other candidate exhibited a less volatile

temperament and could have deemed that candidate more qualified. Accordingly, White has not

established a genuine issue of material fact as to his § 12112(d)(2) claim.[70] The Court, therefore,

grants the MSJ.

**IT IS ORDERED** that the (i) the requests for relief in Defendant Town of Hurley's

Omnibus Motion for Summary Judgment and Memorandum in Support Thereof, filed August 31,

2018 (Doc. 33), are granted; (ii) the Defendant's *Daubert* Motion to Exclude the Testimony and

---

[70]The Town of Hurley contends that White cannot sustain a disparate treatment claim against it for its failure to hire him. See MSJ at 26-27. White rests his contentions on the alleged § 12112(d)(2) violation. For the reader's edification, the Court notes, however, that White cannot show a genuine issue of material fact for a disparate treatment claim arising from the Town of Hurley's failure to hire him after the April, 2016, interview.

> To establish a prima facie case of discrimination under the ADA, a plaintiff must show "(1) that he is disabled within the meaning of the ADA; (2) that he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) that he was discriminated against because of his disability."

Davidson v. Am. Online, Inc., 337 F.3d at 1188 (quoting McKenzie v. Dovala, 242 F.3d at 969). If White establishes a prima facie case, the burden shifts to the Town of Hurley "to articulate a legitimate, nondiscriminatory reason for" not hiring him and, if it does so, "the burden shifts back to" White "to demonstrate that the proffered explanation is a pretext." Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202-03. The parties dispute only the second and third elements of the prima facie case. As the Court concludes in sub-section A of the Analysis' Section II, White has not shown a genuine issue of material fact whether he was a qualified individual; he was not. The parties do not dispute that an adverse employment action occurred. White does not establish a prima facie case by stating that an interviewer asked questions that 42 U.S.C. § 12112(d)(2) prohibited, because the question standing alone did not work a significant change in White's employment status. See, e.g., Dick v. Phone Directories Co., 397 F.3d at 1268. Actions surrounding hiring decisions, however, constitute adverse employment actions, see Dick v. Phone Directories Co., 397 F.3d at 1268, and the Town of Hurley chose not to hire White, MSJ ¶ 27, at 6 (citing April 28 Letter; Stevens Depo. at 12:21-13:9). As discussed in the text in the Analysis Section II(C) above, however, even if White can establish prima facie of discriminatory intent, he has not shown a genuine issue of material fact whether the Town of Hurley had a legitimate, nondiscriminatory reason for not hiring him. The facts are undisputed that it had a legitimate, nondiscriminatory reason -- that his temperament worried the interviewers.

Opinions of Brian H. Kleiner and Memorandum in Support Thereof, filed August 31, 2018 (Doc. 34), is granted in part and denied in part; (iii) the Court does not consider as facts in its summary judgment, and will not permit Brian Kleiner to testify to, Kleiner's opinions in the Report of Brian H. Kleiner, PH.D., filed August 31, 2018 (Doc. 34-1)("Kleiner Report"); (iv) for the Memorandum Opinion and Order's purposes, the Court treats Kleiner's opinions as additional legal argument; and (v) the Court will not admit the Kleiner Report at trial.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Jim Foy
Jim Foy & Associates
Silver City, New Mexico

    *Attorneys for the Plaintiff*

Matthew Bullock
Mark D. Jarmie
Mark D. Standridge
Jarmie & Associates
Las Cruces, New Mexico

    *Attorneys for the Defendant*